**In re the Marriage of Camille Ann CAIN, Appellant,**

v.

**John William CAIN, Respondent.**

**No. 9948.**

Missouri Court of Appeals, Springfield District.

April 12, 1976.

Motion for Rehearing or to Transfer Denied May 5, 1976.

Application to Transfer Denied June 14, 1976.

Julian J. Ossman, Myers, Webster & Perry, Webb City, for appellant.

George G. Allen, Jr., Niewald, Risjord & Waldeck, Kansas City, Jon Dermott, Ronald E. Mitchell, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for respondent.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

FLANIGAN, Judge.

This action for dissolution of marriage was instituted by John William Cain, petitioner below and respondent here, against his wife Camille Ann Cain, respondent below and appellant here. The parties will be referred to by their first names.

John was born in 1930. He graduated from high school, attended junior college and, in 1953, graduated from the Illinois College of Podiatry. In 1956 he commenced the practice of his profession in Joplin, Missouri.

On September 27, 1958, John purchased, and in his own name obtained the title to, a certain tract of land referred to in the record as "the farm." To meet the purchase price of $20,000 John made a down payment of $3,500 and gave his note for $16,500 secured by a mortgage on the farm. The note was payable in monthly installments of $141.19, and John made seven such payments prior to the marriage.

Several months after he purchased the farm, John met and courted Camille. They were married on May 16, 1959, and they did not separate until March 10, 1974. They lived on the farm until 1967.

Camille was a junior college graduate, having had "business type courses, typing and shorthand." Prior to the marriage she worked in a physician's office as a secretary-receptionist and she continued that

employment until shortly before the birth of the first child, Steven, on July 29, 1960. Two other children were born to the marriage, Rachel on March 7, 1962, and Janet on February 23, 1965.

John's practice was a prosperous one and by 1973 it was operated as a professional corporation of which John was sole officer. His salary for that year was $74,060.

During the marriage eight more tracts of land were purchased. Six were purchased in the joint names of John and Camille and are still mortgaged. Two were purchased in John's name alone and one of them is still mortgaged.

The judgment of the trial court dissolved the marriage, awarded custody of Rachel and Janet to Camille and Steven to John, prescribed visitation rights, set apart the farm to John, divided the marital property (including the other tracts of real estate and certain personal property), required John to pay Camille maintenance and to pay her support for the two children in her custody, and awarded Camille suit money and attorney's fees. The particulars of the judgment, so far as relevant to the points on appeal, will be set forth later.

Camille's three appellate contentions, in summary form, are: first, that the trial court erred in finding that the farm was not "marital property"; second, that the trial court erred in the manner in which it divided the marital property; third, that the trial court's award of "maintenance" to Camille was inadequate.

In this court-tried case the mode of appellate review is governed by Rule 73.01, subsec. 3, V.A.M.R. See also *In Re Marriage of Powers*, 527 S.W.2d 949, 954 (Mo.App. 1975).

### IS THE FARM "MARITAL PROPERTY?"

This action was filed on March 25, 1974, and accordingly it is subject to the provisions of § 452.300 to 452.415 V.A.M.S. These statutes, which have been referred to as the "Divorce Reform Act" and "Modified No Fault Divorce Reform," *Claunch v. Claunch*, 525 S.W.2d 788, 790 (Mo.App.

1975), will be referred to in this opinion as "the act."

Section 452.330 V.A.M.S. provides in part:

"1. In a proceeding for . . . dissolution of marriage . . . the court shall set apart to each spouse his property and shall divide the marital property in such proportions as the court deems just after considering all relevant factors, including . . ." The statute then sets forth four factors. The trial court held that the farm is not "marital property" and this court agrees.

■ For purposes of the act only, § 452.-330, subsec. 2, defines "marital property" to mean "all property acquired by either spouse subsequent to the marriage" with five exceptions. If the farm was not "acquired by either spouse subsequent to the marriage," it does not meet the basic definition of "marital property" and, in that event, the applicability of any of the five exceptions need not be explored.

At p. 790 of *Claunch* it is said:

"Although, as indicated, the act defines 'marital property,' it does not define 'property.' But § 1.020 provides, in pertinent part, 'As used in the statutory laws of this state, unless otherwise specifically provided or unless plainly repugnant to the intent of the legislature or to the context thereof: . . .

(8) 'Personal property' includes money, goods, chattels, things in action and evidence of debt; . . .

(11) 'Property' includes real and personal property;

(12) 'Real Property' or 'premises' or 'real estate' or 'lands' is coextensive with lands, tenements and hereditaments; . . .'"

It should be noted that § 452.330, in requiring the court to "set apart to each spouse his property," does not define "his property." Obviously the farm was "property" but was it "John's property" within the meaning of the statute?

Camille points out that during the marriage 187 monthly payments of $141.19 each

were made on the loan on the farm and that a small balance remains due. Camille says that these payments were made with money which was itself "marital property." Camille argues that "whether property is marital or non-marital should depend upon the source of the funds used to acquire the property, not upon the time at which bare legal title was acquired." Camille claims that prior to the marriage John paid $4,480.33 toward the purchase of the farm; that during the marriage "marital funds" (Camille's term) in the amount of $26,402.53 were applied to the purchase price; that, accordingly, marital funds have paid for (approximately) 85 percent of the interest in the farm and John's separate funds have paid for 15 percent of that interest. Thus, Camille says the trial court should have awarded John 15 percent of the interest in the farm and divided the remaining 85 percent equally between John and Camille.[1]

Section 452.330 does not use the term "separate property" to describe "his property," i. e., that which the court is required to "set apart to each spouse." However, the term has been used in a leading article[2] on the "property provisions" of the act and seems peculiarly apt.

Accordingly the inquiry is, was the farm John's separate property and, if so, was its status altered or affected by the fact that it was subject to a mortgage or by the addi-tional fact that some of the payments on the mortgage were made with money which itself was "marital property"?

In *Conrad v. Bowers*, 533 S.W.2d 614 (Mo. App.1975), a dissolution proceeding, Mr. Bowers, prior to the marriage, acquired some land which was referred to as the "Lombard property." Title was in his name alone. At the time of the trial there was a mortgage on the Lombard property, although the opinion does not reflect whether that mortgage antedated the marriage, nor does it show the source of the mortgage payments.

The court said: "[I]t was not disputed that the Lombard property was purchased and titled in the name of Mr. Bowers prior to his marriage with the appellant and re-mained so titled after the marriage. The Lombard property, therefore, is not marital property, and should be set apart to Mr. Bowers. The implication of subsection 2 of § 452.330 is clear that property acquired prior to, rather than subsequent to, the marriage and maintained and treated as such after the marriage is not marital prop-erty. That is what Mr. Bowers has done with the Lombard property, and that prop-erty is to be considered as his separate property and must be 'set apart' to him."

*Conrad*, accordingly, supports the proposi-tion that the fact that the farm was mort-

1. Camille's argument is based primarily on California authorities. See, for example, *In Re Marriage of Jafeman*, 29 Cal.App.3d, 244, 257, 105 Cal.Rptr. 483, 491[11, 12] (1972), where it is said: "If community funds are used to pay part of the purchase price on property acquired by one spouse prior to the marriage, the prop-erty cannot be considered wholly community for the separate and community sources of the property can be traced. (authorities cited) The community has a *pro tanto* interest in such property in the ratio that the payments on the purchase price made with community funds bears to the payments made with separate funds. (authorities cited) The community in-terest is determined by comparing the ratio of the community investment to the total separate and community investment in the property. If the fair market value has increased dispropor-tionately to the increase in equity, the commu-nity is entitled to participate in that increase in a similar proportion. (authorities cited)" The California rule has been said to be "Contrary to the rule adopted in most community property states, under which the community has only the right of reimbursement for payments made with community funds on the purchase price of property purchased by one spouse before mar-riage." *Forbes v. Forbes*, 118 Cal.App.2d 324, 257 P.2d 721, 722 (Cal.App.1953).

2. 29 Missouri Bar Journal (Nov.-Dec. 1973) p. 508, written by Attorney Ray Fowler and Pro-fessor Joan Krauskopf.

The following language appears in Missouri Practice, Vol. 1A § 1065.25 where there is a discussion of the act:

"Before dividing the marital property be-tween the spouses, the court must identify and set aside each spouse's separate property. Thus, property acquired prior to marriage re-mains separate property of the spouse who owned it."

gaged is not alone sufficient to remove it from the classification of separate property. It must be conceded that if John had purchased the farm outright and had remained single, the farm was "his property." Before he met Camille he had the legal title to it but it was an encumbered title. Did his status as a mortgagor render him any less the owner of the farm?

"A mortgagor in possession is generally held to be the owner, but not after foreclosure and sale." 63 Am.Jur.2d Property § 34, p. 319. "[A] mortgage is a mere lien on real estate." *Kline v. McElroy*, 296 S.W.2d 664, 665[1] (Mo.App.1956).

"The modern doctrine is well established that a mortgage is but a security for the payment of the debt or the discharge of the engagement for which it was originally given; and until the mortgagee enters for breach of the conditions, and in many respects until final foreclosure of the mortgage, *the mortgagor continues the owner of the estate, and has a right to lease, sell, and in every respect to deal with the mortgaged premises as the owner*, so long as he is permitted to remain in possession." (Emphasis added) *Benton Land Co. v. Zeitler*, 182 Mo. 251, 81 S.W. 193, 197 (1904).

The following language appears in Tiffany, The Law of Real Property, 3d Ed. Vol. 5, § 1380, p. 232: "In other states the view that the mortgagee has the legal title is entirely superseded, both at law and in equity, by the view which has always prevailed in equity, that he has merely a lien to secure his debt." Citing *Benton*, Tiffany says, "This view prevails in Missouri."

At § 1411, p. 296 it is said: "Even in jurisdictions in which the title theory of a mortgage is adopted, the mortgagor is for

most purposes regarded as the substantial owner of the land. In jurisdictions in which the lien theory is adopted, *there can obviously be no question that the mortgagor is the owner*." (Emphasis added) Additional authorities appear below.[3]

■ This court concludes that the fact that the farm was subject to a mortgage does not per se alter or affect its status as John's separate property if such was its status absent the mortgage.

John argues that at least some of the payments on the mortgage were made from rent derived from the farm. John states "since the farm was separate property, the income derived from it was also separate property." This assertion is inconsistent with the Commissioners' Note to § 307[4] of the Uniform Marriage and Divorce Act, on which § 452.330 is somewhat modeled. *Claunch*, supra, 525 S.W.2d at p. 791.

Section 452.330, subsection 2(5) excludes from marital property "the increase in value of property acquired prior to the marriage." The counterpart is subsection (b)(5) of § 307 which excludes from marital property "the increase in value of property acquired before the marriage." The latter language in the Commissioners' Notes receives this comment: "The phrase 'increase in value' used in subsection (b)(5) is not intended to cover the income from property acquired prior to the marriage. Such income is marital property."

This court concludes, however, that the fact that some of the payments on the mortgage were made with money which itself was marital property does not alter or affect the status of the farm as John's separate property. The following authorities lead to this conclusion.

**3.** "[I]n the absence of a stipulation in the mortgage to the contrary, the mortgagor is owner to all the world, and is entitled to the rents and profits until the mortgagee enters into the actual possession or takes some equivalent action." *In Re Title Guaranty Trust Co.*, 113 S.W.2d 1053, 1057[7] (Mo.App.1938).

"A mortgage . . . particularly by the laws of Missouri, 'is regarded as nothing more than a mere lien, encumbrance, or security for a debt, and passes no title or estate to the

mortgagee, and gives him no right or claim to possession of the property . . . and the mortgagor is the real owner and the holder of legal title or mortgaged property, unless otherwise specifically provided.' " *Park Nat. Bank v. Travelers Indem. Co.*, 90 F.Supp. 275, (D.C. Mo.1950).

See 6 Mo.L.R. 200 (1941) "Real Estate Mortgage Theory in Missouri."

**4.** Section 307 appears at p. 490 of Uniform Laws Annotated, Vol. 9, Master Edition.

"Property is classified as separate or community when it is acquired. As used in this connection the word 'acquired' contemplates inception of title." 15 Am.Jur.2d Community Property § 22, p. 836. "The status of the property as community or separate is fixed as of the time that title is acquired." Tiffany, The Law of Real Property, 3d Ed., Vol. 2, § 439, p. 241. "When property is purchased before marriage and the payments are completed afterward with community funds, the property usually is found to be separate and the community reimbursed for its outlay." Powell, Law of Real Property, Vol. 4A, § 624.4, p. 735.

The following language appears in 41 C.J.S. Husband and Wife § 483, p. 1023: "After property purchased on credit or with borrowed funds has acquired the status of separate property of one of the spouses at the time of purchase, its status remains such regardless of the nature of the funds which thereafter satisfy the obligation, whether community funds or separate funds of the other spouse."

Other authorities support the proposition that once property acquires the status of separate property, it does not lose that status solely because marital funds are devoted to the reduction or elimination of an encumbrance.[5]

It is true that some of the foregoing authorities, and some of those cited in footnote 5, are consistent with the following proposition expressed in 41 C.J.S. Husband and Wife § 510a(4), p. 1080: "Where property is purchased with community and separate funds, and the acquisition nevertheless is held to belong to the separate estate, the community has a claim against the separate estate for the amount of its contribution to the purchase price, and such a claim is a charge or lien on the property so acquired."

This court confines its holding to the fact that the farm was and is John's separate property and the trial court properly treated it as such and set it apart to John. In view of the presence and size of the other assets of the parties, making it possible for this court to divide the marital property and to grant maintenance without imposing on the farm a lien or charge in favor of Camille, the legality of such an imposition need not be explored.[6]

In defining "marital property," § 452.330, subsection 2, states that, for purposes of the

5. "The character of purchased property, as separate or community property, is fixed at the time it is acquired, whether or not the entire purchase price is paid at the time of acquisition. If it is community property at time it is acquired, it remains community property even though the separate funds of either spouse be used to pay the purchase price debt balance or the financed part of the price. *The same thing is true if it is separate property at the time it was acquired and community funds are used to pay the balance or financed part.* In either case a right to reimbursement can be established by tracing funds used to pay the balances, with subrogation in some cases to rights of a seller, but *the ownership of the property is not affected.*" (Emphasis added) *Hodge v. Ellis,* 268 S.W.2d 275 (Tex.Civ.App.1954) at p. 283[10].

"Property acquired in community property states takes its status as community or separate property at the very time it is acquired, and is fixed by the manner of its acquisition. *Woods v. Naimy,* 9 Cir., 69 F.2d 892; *Leinnewebber v. George,* Tex.Civ.App., 95 S.W.2d 478; *Wilson v. United States,* 9 Cir., 100 F.2d 552.

If property is acquired by the wife it is her separate property at that very time, and the fact that a part of the purchase money is later paid out of the community or separate estate of the other spouse does not alter such status. *Colden v. Alexander,* 141 Tex. 134, 171 S.W.2d 328; *White v. Hebberd,* Tex.Civ.App., 89 S.W.2d 482; *Merritt v. Newkirk,* 155 Wash. 517, 285 P. 442." *Laughlin v. Laughlin,* 155 P.2d 1010 (N.M.1944) at p. 1020[12].

See also *Gapsch v. Gapsch,* 76 Idaho 44, 277 P.2d 278 (1954); *Gillespie v. Gillespie,* 84 N.M. 618, 506 P.2d 775, 778[2, 3] (1973); *Lincoln Fire Ins. Co. v. Barnes,* 53 Ariz. 264, 88 P.2d 533 (1939); *In Re Pugh's Estate,* 18 Wash.2d 501, 139 P.2d 698 (1943); *Iredell v. Iredell,* 49 Wash.2d 627, 305 P.2d 805 (1957); *Orr v. Pope,* 400 S.W.2d 614 (Tex.Civ.App.1966); *Fisher v. Fisher,* 86 Idaho 131, 383 P.2d 840, 842[2] (1963).

6. See 54 A.L.R.2d 416 ("Use of Community funds in improving, or discharging encumbrance on, separate property as grounding right to reimbursement, lien or charge.")

act only, the term means "all property acquired by either spouse subsequent to the marriage," with five exceptions. One of those exceptions is "property acquired in exchange for property acquired prior to the marriage." Another exception is "the increase in value of property acquired prior to the marriage." It seems clear, then, that property acquired prior to the marriage is not marital property. Obviously anything acquired prior to the marriage was not acquired after it, at least if acquisition occurs at one specific time and is not the gradual result of a continuing process. Camille's argument is, in essence, that each of the post-marriage mortgage payments effected an acquisition. This contention is rejected.

If acquisition is not accomplished until full payment of the purchase price and the removal of the encumbrance, many, if not most, marriages would have little land which would qualify as marital property. Financial hardship is a major cause of marital breakups and people in low economic circumstances usually have a mortgage on their home. If the presence of that mortgage meant that the home had not been "acquired" within the meaning of § 452.330, subsection 2, it would not constitute "marital property" and the court would have no power to divide it. Such a result would strike at the very vitals of the act and would, for many marriages, place the principal asset beyond the court's power to divide.

The word "acquire" is thus defined in Webster's Third International Dictionary: "To come into possession, control or power of disposal of." The American Heritage Dictionary of the English Language gives this definition: "To gain possession of." In *Chief Freight Lines Co. v. Industrial Commission*, 366 S.W.2d 48 (Mo.App.1963) it is said that the word "acquire" is one of very broad meaning and includes "to gain by any means; to get as one's own." There it is said to be synonymous with "obtain" and "procure."

In *Denver Dept. of Welfare v. Gomer*, 141 Colo. 65, 346 P.2d 1016 (1955) the crucial issue, for purposes of entitlement to welfare, was when one Gomer "acquired" certain land. A contention was made that the acquisition of the land by Gomer did not take place until the mortgage on it had been paid. The court rejected the contention and said at p. 1017: "It would be a strained construction, indeed, to declare as a proposition of law that when one gets out of debt he acquires or obtains possession of property, moneys or credit. At every stage of the twenty years in which these parties were intermittently on relief the debt on the house was being reduced. It would be difficult to ascertain at what point in the twenty years this 'acquisition of property' started or became a reality to these people."

It is indisputable that John came into possession[7] of the farm prior to the marriage. He had the control of it. Prior to this proceeding it was his to improve, lease, sell,[8] subdivide, devise, and even to further encumber, subject of course to the lien.

This court holds that John acquired the farm on September 27, 1958, that it then became John's separate property, and that neither the mortgaging of it by John nor the use of marital property, in the form of money, to reduce the balance of the loan, removed the farm from its classification as "his property" as that term is used in § 452.330, subsection 1.

Accordingly, the trial court properly set apart the farm to John but, as will be seen, the presence of the mortgage and the sources and degree of its partial discharge are facts which influence the manner in

7. "Where, as is true in most jurisdictions now, a mortgage is regarded both in law and equity as a mere lien, and not a conveyance of the title, the mortgagee has no right as such, either before or after default, to the possession of the property mortgaged, but the right of possession until foreclosure and sale remains in the mortgagor and those claiming under him." 55 Am. Jur.2d Mortgages § 183, p. 310.

8. "Clearly, a husband may now convey his separate property without his wife joining in the deed." *Wilkinson v. Vaughn*, 419 S.W.2d 1, 8[18] (Mo.1967).

which the marital property is divided under § 452.330.

## DID THE TRIAL COURT PROPERLY DIVIDE THE MARITAL PROPERTY?

With the exception of the farm, the judgment of the trial court treated all the assets as marital property, and neither John nor Camille complains of that classification.

The trial court divided the marital property [9] as follows:

### To John:

#### Real Estate

|  | Value | Mortgage | Equity | Monthly Rental Income |
|---|---|---|---|---|
| Tract A | $35,000.00 | $6,442.00 | $28,558.00 | $125.00 |
| Tract B | 29,750.00 | 975.00 | 28,775.00 | 0 |
| Tract E | 25,000.00 | 967.00 | 24,033.00 | 150.00 |
| Tract F | 9,000.00 | 0 | 9,000.00 | 0 |
|  |  | Total Equity | $90,366.00 |  |

#### Personal Property

|  |  |
|---|---|
| Cadillac automobile | 7,000.00 |
| Life insurance policies (less policy loan) | 6,951.28 |
| 100 Shares Joplin Podiatry, Inc. | 59,735.01 |
| Total Personal Property | $73,686.29 |
| Total to John | $164,052.29 |

### To Camille:

#### Real Estate

|  | Value | Mortgage | Equity | Monthly Rental Income |
|---|---|---|---|---|
| Tract C | $65,000.00 | $22,309.00 | $42,691.00 | 0 |
| Tract D | 10,000.00 | 1,569.00 | 8,431.00 | 0 |
| Tract G | 45,000.00 | 27,702.00 | 17,298.00 | 102.00 |
| Tract H | 3,419.00 | 2,612.00 | 807.00 | 0 |
|  |  | Total Equity | $69,227.00 |  |

#### Personal Property

|  |  |
|---|---|
| Pontiac automobile | 7,000.00 |
| 1 Share Twin Hills Golf & Country Club | 500.00 |
| Kansas City Airport Bonds | 4,966.98 |
| United Investment Plan Shares | 782.21 |
| Household furnishings | 3,174.00 |
| Total Personal Property | $16,423.19 |
| Total to Camille | $85,650.19 |

---

9. The trial court's decree did not assign specific values to the items. Though the evidence concerning values was conflicting on some items, the conflicts were not major and this court has determined the values to be as tabulated. Some inconsequential and offsetting details of

In dividing the marital property "in such proportions as the court deems just," § 452.-330 (subsec. 1), the trial court must consider "all relevant factors including:

(1) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(2) The, value of the property set apart to each spouse;

(3) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and

(4) The conduct of the parties during the marriage."

The application of the factors mentioned in the statute "cannot be accomplished by the utilization of a mathematical formula." *Claunch v. Claunch*, 525 S.W.2d 788, 792[5] (Mo.App.1975).

Factors (1) and (4) will be considered together.

The legislature did not have the temerity to define "homemaker," and properly so. Black's Law Dictionary (Rev. 4th Ed.) never heard of the word nor, at this writing, has C.J.S. According to the American Heritage Dictionary a homemaker is "a person who manages a household, especially a housewife." Webster's circular definition is "one that makes a home." But the word is one of infinite variety and any person presumptuous enough to trace its ambit probably has not had the privilege of marrying one. It is doubtful that the role may not be shared, at least in the usual household.

But, at least primarily, John was the breadwinner and Camille was the housewife and mother. If due respect is accorded to these roles, no significant disparity in their respective contributions to the acquisition of the marital property is disclosed.

The evidence concerning conduct had the traditional conflicts. The testimony of John's mother, at least in part, was critical of her daughter-in-law. Camille countered by producing a neighbor whose testimony, at least in part, was critical of John. The neighbor was the wife of one of Camille's attorneys. But most of the testimony concerning conduct came from the parties.

Camille's evidence showed that John did very little work around the house. At least twice John beat Camille with his fists. On occasion John drinks too much. Camille, however, conceded that John was a good provider who "devotes his life to the children and the practice but the practice first." She thought John's behavior was, on occasion, irrational. John had accused her, falsely she says, of having an extra-marital affair. There is a tacit suggestion in her evidence, denied by John, that he had a similar involvement.

John's evidence showed that Camille was frequently uncommunicative, that she had a "terrific male hatred and regarded me and our sex life as dirty." Camille did not entertain as often as John thought she should but he, with some frequency, brought business associates to the home for dinner "on my orders." He says that Camille likes to socialize, play golf and tennis and work at the historical society. He admitted, however, that he had no objection to Camille's not seeking outside employment after the children were born. "She had the children to raise and she had to be a wife and it was a mutual understanding."

The family had an excellent income and spent much of it. It is not uncommon for wives of affluent men to refrain from outside work and to engage in civic and country club activities. Whatever the problems were which led to the downfall of the marriage, it is manifest that financial hardship is not among them. Perhaps there was too much financial success. In any event, neither of the spouses emerges as the hero or the villain of this ill-fated union.

the court's division are not shown. Of course the trial court, in addition to awarding John the

items shown in the table, set apart the farm to him.

With regard to factor (2), the trial court, as has been seen, set apart the farm to John. At the time of the trial the balance due on the mortgage on the farm was about $5,000.

The value of the farm has dramatically increased since its acquisition in 1958. It is now bounded on one side by Joplin's major shopping center and on the other by Missouri Southern State College. Neither side invoked Rule 73 to request findings of fact and the trial court made no specific finding of the farm's value. The court did find that the appreciation in value since date of acquisition was "due to the development of adjacent property and not to any efforts made by" John or Camille. No improvements have been added since John acquired it.

Since the farm was acquired by John prior to the marriage, neither it (§ 452.330, subsec. 2) nor its increase in value (§ 452.330, subsec. 2(5)) is "marital property," but under § 452.330, subsec. 1(2), its present value is one of the factors which must be considered when the court divides the marital property.

The testimony of Camille's real estate expert, Moore, was that the farm (which contains 78.2 acres) has a value of approximately $565,000. The mortgage would reduce that figure to approximately $560,000. Moore also made appraisals of the eight marital property tracts.

John's real estate expert, Kelly, gave his appraisals of the eight marital property tracts and they were in general accord with those of Moore. However, Kelly did not appraise the farm and gave no testimony on its value. John's attorney, explaining that omission, said "we did not have [the farm] appraised because of the statutory exemption being owned prior to the marriage." The explanation is a lame one because the pleadings of both parties requested division of the marital property and, as indicated above, the value of the farm is a specific statutory factor.

John's appellate brief mentions and the record shows that one or two years before the trial John received a "lukewarm offer" of $117,300 for the farm at a time when he was demanding $273,700. Significantly John himself, although legally qualified to do so, *State v. Northeast Building Co.*, 421 S.W.2d 297, 301[3] (Mo.1967), offered no opinion with regard to the present value of the farm. Nor did John make any attempt to rebut the testimony of Moore on the point.

It is also true that a substantial portion of the mortgage indebtedness on the farm has been paid with money constituting marital property. This is a "relevant factor" which (including the four enumerated in § 452.330, subsec. 1) this court has considered in dividing the marital property.

Clearly the value of the farm, as one of the relevant factors, dictates that Camille is entitled to a far greater share of the marital property than she would be if it were not in the picture.

Germane to factor (3) is that the trial court awarded the family home (Tract C) to Camille and gave her custody of Rachel and Janet.

At the time of the decree Camille was not employed. Her economic circumstances are far less desirable than those of John. As its value indicates, and as the family financial history would suggest, the family home is a nice one. The monthly mortgage payments on it are $193.50. Also awarded to Camille were Tracts D, G, and H, but only one of them produces rent and all are mortgaged.

John and Camille's joint 1973 federal income tax return shows an adjusted gross income of $76,680, of which $74,060 was John's salary paid him by his professional corporation. Though income tax returns for the years 1972, 1971, and 1970 were not offered, the 1973 return shows a taxable income for those years of $52,993, $81,273, and $79,241.

But John claims that his salary for the first six months of 1974 ($20,000) has decreased substantially from what it was during the same period of 1973 ($30,000). John explains the decrease by claiming that Medicare suspended payments to him be-

cause "I made too much money last year" and "they cut you off during the investigation." He admitted, however, that some of the Medicare money would in time be paid. Similar difficulties with similar prospects of ultimate collection were encountered with Blue Shield and a local industry. He also says that the gas shortage reduced the number of his patients, as did the appearance of two new podiatrists in the area.

John's office is open only four days a week. During the first six months of 1974 he missed eleven days because of illness, spent a week in Montana, two weeks in Canada, and made other shorter trips.

Factor (3) favors Camille.

This court concludes that the trial court's division of the marital property is clearly erroneous. Accordingly it is modified as follows:

In addition to the property heretofore awarded Camille by the trial court, she is hereby awarded Tract A, Tract E, and Tract F.[10] In all other respects the trial court's division of the marital property is affirmed.

■ Both John and Camille should be, as between themselves, relieved of any further liability on any indebtedness which is secured by a mortgage on land awarded to the other. The one receiving a tract on which such a joint loan exists will assume, as between them, the primary duty to pay and will hold the other harmless from any further liability thereon. The trial court is directed to make appropriate provision to that end.

## IS THE AWARD OF MAINTENANCE ADEQUATE?

■ The trial court ordered John to pay Camille $75 per week per child for the support of Rachel and Janet. It granted maintenance to Camille in the sum of $700 per month for seven years, thereafter $500 per month for three years and thereafter $200 per month for two years, the mainte-

nance to terminate at the end of twelve years or upon Camille's earlier remarriage.

In granting maintenance the trial court found that Camille lacked "sufficient property, including marital property apportioned to [her] to provide for [her] reasonable needs" (§ 452.335, subsec. 1(1)) and further found that Camille "is unable to support [herself] through appropriate employment or is the custodian of [children] whose condition or circumstances make it appropriate that [Camille] not be required to seek employment outside the home" (§ 452.335, subsec. 1(2). This court has determined that its reapportionment of the marital property, under the facts here, does not disturb these findings.

Neither Camille nor John has complained about the "stair-stepping" aspect of the maintenance order (see In Re Marriage of Powers, 527 S.W.2d 949, 955[11–12] (Mo. App.1975)). Predictably Camille says the award is too low while John asserts its excessiveness. The seven nonexclusive "relevant factors" to be considered in setting maintenance are contained in § 452.-335, subsec. 2. Those factors are considered in their statutory sequence.

Camille's financial resources, including her share of the marital property, have been outlined. It was her testimony that for her own reasonable needs she requires $1,464 monthly. John testified that her reasonable needs may be met with $400 to $500 a month but he admitted that he was assuming she could move to a more modest home. His itemized estimates of her needs were manifestly low, hers too high, and the trial court properly found a middle ground.

The provisions of the decree for support of the two daughters did not include "a sum for [Camille] as custodian."

Camille is a junior college graduate, with some medical office experience, but she has not been employed for over fifteen years. In view of the ages of the two girls the trial court may have felt that no more than part time employment would be appropriate at present.

10. Tract B, which is to be retained by John, is the land on which his office is situated.

The standard established during the marriage was high and the marriage lasted approximately 15 years.

Camille's age is not shown but she graduated from junior college in 1957. John is in his mid-forties. Camille's "physical and emotional condition" appears normal, as does John's.

John's ability to meet his needs while meeting those of Camille is evident. Camille's conduct during the marriage has been discussed.

This court, after weighing these factors, holds that the maintenance award is just and proper and the decree in that respect is affirmed.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

All concur.