In re the MARRIAGE OF Sara SCHULTE, Appellant,

and

Joseph C. Schulte, Respondent.

No. 9807.

Missouri Court of Appeals, Springfield District.

Jan. 11, 1977.

Emerson Foulke, A. L. Shortridge, Joplin, for appellant.

L. R. Buehner, Charles E. Buchanan, Buehner & Buehner, Joplin, for respondent.

HOGAN, Judge.

This is an action for dissolution of a marriage under the Dissolution of Marriage or Divorce Reform Act, now codified as §§ 452.250–452.415, RSMo Supp.1975. The trial court found the marriage irretrievably broken and ordered it dissolved. Further, the court awarded petitioner Sara Schulte 12,000 shares of stock in Talbot-General Wire Products, Inc., as her share of the marital property and granted her an indefinite maintenance order in the amount of $375 per month. Sara appeals, contending 1) that § 452.330 violates Mo.Const. Art. I, § 13, because it retrospectively deprives her of vested property rights, and 2) that the disposition of marital property and the amount of maintenance allowed are unconscionable, if authorized by law. No issue is tendered concerning the irretrievable breakdown of the marriage nor the custody of the parties' three children.

By way of brief background sketch, it appears that Sara and J.C., as the parties are referred to in the record, were married August 26, 1950, J.C. was, and is, a practicing dentist. Before their marriage, Sara worked as a dental assistant in J.C.'s office. Sara had been married before she married J.C., and J.C. adopted her son, James.

After the marriage, Sara continued working in J.C.'s dental office. Sara was the only employee. Her testimony was that she worked at the office and at home on the bookkeeping, and that she and her husband lived very frugally, because J.C. "didn't believe in debts". From time to time, Sara was warned "don't spend a dime this week other than what you have to" because the two "wanted to pay on [their] property,

stocks and bonds." At the time of their marriage, Sara owned no property, and J.C. owned only a lot at 1720 Annie Baxter Street in Joplin. The two had a house built on that lot during the first years of their marriage, and it stands admitted that both J.C. and Sara participated in the construction of the house. Sara's testimony was that during the early years of her marriage, "it was rough for a while, all I got was $20.00 a week [J.C.] gave me for my clothes and grocery money."

Without going into detail, it is apparent from the record that J.C. and Sara prospered, by community standards. They became the parents of two children, built a new home, joined a country club and traveled. They acquired a considerable amount of property, of which we shall speak further. It stands admitted, as we understand the record, that all the property in issue was accumulated before the parties separated. J.C. belittled Sara's assertions that she had lived frugally and denied that Sara had been required to work in the office after the children were born, but he admitted that for 18 years after the two were married, he "couldn't have been more pleased" with Sara as a wife and mother.

The cause of the parties' separation is, of course, disputed. J.C.'s testimony was that Sara started staying out late after her regular Tuesday golf date—"she might be late or sometimes didn't show up at all." Sometimes Sara stayed out all night. J.C. asked Sara where she had been, but received only "[v]ague answers". Several times he located her at Glady's Heidelberg Inn, a Joplin bar, at first alone, but later with others. "It eventually became known," according to J.C., that Sara was "running around" with a man named Hughes. Because he was "bird dog enough to want to know", J.C. followed Sara; he had seen her car parked outside Hughes' apartment, sometimes overnight. J.C.'s version of the facts was that he had many times asked Sara to return, but his entreaties had fallen on deaf ears.

Sara's testimony was that she had left home because, "We just couldn't settle our

differences." She stated quite unequivocally that J.C. "liked to abuse [her] physically" and she eventually became afraid of him. Sara admitted staying out overnight "once or twice". Mr. Hughes, called as a witness, admitted knowing both parties, said he had "occasionally" kept company with Sara, but denied any impropriety. J.C. admitted striking Sara, but intimated that he had done so only because her conduct had driven him to distraction. There is much evidence other than that which we have recited, but our statement illustrates the tenor of the cause.

Broadly stated, the appellant's first point is that to the extent it permits an unequal distribution of marital property, § 452.330 violates Mo.Const. Art. I, § 13,[1] because it operates to allow a court to divest a spouse of his vested interest in entirety property. Arguing that her point requires only "application" of established constitutional principles, as distinguished from "construction" of Mo.Const. Art. I, § 13, the appellant urges application of that section to void the distribution of marital property. The respondent joins in this clamor, maintaining that Rule 83.06, V.A. M.R.,[2] is inadequate and we should transfer the case to our Supreme Court pursuant to Rule 83.02, V.A.M.R., because of the general interest and importance of the case. There is, in point of fact, no constitutional question present on this appeal, nor would there be any such question before our Supreme Court if we exercised our authority to transfer the appeal there pursuant to Rule 83.02, V.A.M.R.

The transcript shows that this action was commenced in the Circuit Court of Jasper County on July 30, 1969, when Sara filed a petition for divorce together with a motion for suit money, attorneys' fees and alimony pendente lite. Issue was joined by the filing of an answer and crossbill on September 12, 1969. At some time not clearly indicated the trial court awarded Sara the sum of $300 per month as temporary alimony. Sara's action, as she euphemistically puts it, "remained dormant" until February 22, 1974. Sara then asked leave to file an amended petition on the ground that the Divorce Reform Act had become the law of Missouri and amendment of the petition was therefore necessary. The amended petition concludes with a prayer that the trial court dissolve the marriage and "divide the marital property in such proportions as the Court deems just after considering all relevant factors." We find no motion or objection, oral or written, directed to the constitutionality of the Divorce Reform Act at any place in the record. Indeed, the appellant's jurisdictional statement alleges the appeal to be within the general jurisdiction of the Court of Appeals. Having embraced the act as a basis for her recovery, the appellant may not now disclaim it as an infringement of her constitutional rights. *Nixon v. Nixon,* 525 S.W.2d 835, 837–838[1] (Mo.App.1975).

As for the respondent's contention that the appeal should be transferred because of the general interest and importance of the constitutional issue, we remind counsel that a constitutional issue never raised on trial cannot be considered on appeal. Whatever may have been the appropriate stage to raise a constitutional issue in this bench-tried case, it cannot be raised for the first time on appeal as an inherent matter. Consideration of a constitutional issue raised for the first time on appeal would exceed the powers of this court or our Supreme Court. *Christiansen v. Fulton State Hospital,* 536 S.W.2d 159, 160[3] (Mo. banc 1976); *City of St. Louis v. Butler Co.,* 358 Mo. 1221, 1230, 219 S.W.2d 372, 378[7] (banc 1949).

The focal issues on this appeal concern the propriety of the distribution of marital property and the award of maintenance.

---

1. "That no ex post facto law, nor law impairing the obligation of contracts, *or retrospective in its operation,* or making any irrevocable grant of special privileges or immunities, can be enacted." (our emphasis)

2. Which provides for transfer to the Supreme Court upon application of a party prior to opinion if such application is filed within ten days of filing the transcript with the Court of Appeals.

Essentially, Sara contends that the division of marital property is unconscionably disproportionate and the amount of maintenance allowed is wholly inadequate. In this connection, she argues that fault is irrelevant to the distribution of marital property and that the trial court erroneously evaluated the relevant factors enumerated in § 452.330, RSMo Supp.1975. J.C.'s position is that both the division of property and the amount of maintenance awarded are adequate and proper in light of the evidence presented. These contentions call for a subjective review of the evidence. Rule 73.01, para. 3(a), V.A.M.R.; *Murray v. Murray,* 538 S.W.2d 587, 588[3] (Mo.App.1976).

The parties testified at length concerning the property they acquired during their marriage. The trial court held, at least informally, that all the property was marital property as defined by § 452.330, paras. 2 and 3, RSMo Supp.1975,[3] and that ruling is not challenged here. We must acknowledge that there is no tabulation of the marital assets, the evidence touching the value of those assets is diffusely scattered throughout the record, and we are left in doubt about some items, for example, J.C.'s Keogh [H.R. 10] Plan. Nevertheless, we are convinced in this particular case that the deficiencies of the record should not prevent an adjudication of appeal. Determination of the parties' rights has been pending since July 1969—more than seven years—and we bear in mind that it is our duty to finally dispose of the cause on its merits, if possible. Rule 84.14, V.A.M.R.; *Dickey Co., Inc. v. Kanan,* 486 S.W.2d 33, 36[1] (Mo.App.1972); *State ex rel. George v. Mitchell,* 230 S.W.2d 116, 120[5] (Mo.App. 1950).

At trial time the parties were owners of three parcels of realty:

1) A house and lot at 2539 E. 15th Street in Joplin. This is the family residence. It was built in 1957 for $26,000. Sara's testimony was that the house and lot were worth $35,000 and that the household furnishings, including antiques, were worth $10,000. J.C.'s evidence was that the house and lot were worth $32,000 and the furnishings were worth $5,000.

2) An 80-acre farm in Newton County near Diamond, Missouri. This farm was acquired in 1953 for $12,000. Sara's evidence about the value of the farm was that "[w]e were offered at one time $40,000.00 for it." J.C. maintained the offer was only $26,000 and estimated the value of the farm at $30,000.

3) Two lots, described as the Freeman Grove property, acquired in 1948 for $1,850. Sara believed the two lots were worth $5,000; J.C. estimated their value at $2,500. We may note there was evidence that Sara and J.C. bought another tract of land in 1963 for $7,500; it was sold after their separation for $11,250. The net proceeds of this sale were divided equally; Sara received $4,021.30 as her share. So, the value of the marital realty and household furnishings at trial time, depending upon the estimate of value accepted[4] was either $90,000 (Sara) or $69,500 (J.C.). The trial court apportioned all the realty and household furnishings to J.C.

Marital personalty included 1,150 shares in an investment fund known as Investor's Variable Payment Fund; it was stipulated that the value of this stock three days before the trial was $5.52 per share; the total value was therefore $6,348. Further, the parties owned 22,400 shares of stock in a closely-held corporation, Talbot-General Wire Products Inc. of Neosho, Missouri.

**3.** During J.C.'s cross-examination and again at the close of the hearing, the trial court indicated it would find all the property in issue to be marital property. J.C.'s counsel was asked to prepare an appropriate decree. The order prepared does not reflect the trial court's announced finding but of course no specific, written finding was required by § 452.330 in the absence of a request. *Stark v. Stark,* 539

S.W.2d 779, 781[1] (Mo.App.1976). Neither party requested findings pursuant to Rule 73.-01, V.A.M.R.

**4.** The parties' estimates of value varied, e. g., J.C.'s estimates on trial were at variance with his answers to interrogatories; we have taken the most definite figures we can find in the record.

The accountants who regularly audited Talbot-General valued the stock at $5 per share, but testimony of other experts indicated that the stock was not saleable. The corporate secretary projected corporate earnings as being "in the area of 60 to 65 cents per share", but there is other evidence that the book value of the stock was only $1.70 per share, and the accountant's audit for fiscal 1973 shows that the stock paid a dividend of $.04 per share in 1972 and $.05 per share in 1973.

The existence of other assets was shown. J.C. had set up a Keogh [H.R. 10] Plan in December 1968; he had accumulated $11,500 in this account. The details of the plan were not put before the trial court and are not, of course, before us. We shall assume, without specifically deciding, that Sara had some interest in the Keogh Plan.[5] J.C. also "owned" several life insurance policies; the cash value of these policies was $13,690. As we read and understand the record, J.C. had also accumulated the sum of $7,779 in a "fund" known as the American National Investment Fund. The value, or approximate value, of the stocks, insurance policies and savings funds comes to $39,317, excluding the Talbot-General stock. J.C. testified that he owned office equipment worth $5,000 and automobiles valued at $2,287. His debts, excluding current accounts, came to $7,250. To sum up, accepting Sara's estimates and valuing the Talbot-General stock at $5.00 per share, the net value of the marital property was $241,354; accepting J.C.'s estimates, it was $220,854. If we set the value of the Talbot-General stock at its book value, $1.70 per share, the two figures become $167,434 and $146,934. The trial court awarded Sara 12,000 shares of the Talbot-General stock as her full share of the marital property.

In deciding whether the division of marital property was so disproportionate as to be unconscionable, we bear in mind that § 452.330, RSMo Supp.1975, directs the trial court to consider four specifically listed factors: 1) the contributions of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker; 2) the value of the property set apart to each spouse; 3) the economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and 4) the conduct of the parties during the marriage. The factors enumerated are not exclusive. *In re Marriage of Heddy*, 535 S.W.2d 276, 280–281[13] (Mo.App.1976).

Before we turn to the fairness of the apportionment of marital property, a preliminary word is appropriate. Counsel have cited a number of cases decided under the former divorce law and a number of authorities from foreign jurisdictions. With one or two exceptions, the authorities are inapposite. We do not criticize counsels' presentations; the case was well-tried by two able advocates, and the appeal has been vigorously argued here. Nevertheless, since this case was tried—and apparently since it was briefed—a respectable body of precedent dealing with the Divorce Reform Act has developed, and we need not look to precedents under the former law for guidance. We note, in addition, that one or two rules concerning appellate review of orders distributing marital property and orders granting maintenance have developed. The first of these is that § 452.330 does not require an equal division of marital property; it looks only to a subjectively fair and equitable distribution of those assets.[6] The second is that the trial court is vested with considerable discretion in dividing marital

---

5. See: *In re Marriage of Powers*, 527 S.W.2d 949, 957[16] (Mo.App.1975); *In re Marriage of Brown*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561, 566–568[7] [8–10] (bank 1976); *Blitt v. Blitt*, 139 N.J.Super. 213, 353 A.2d 144 (Ch. Div.1976); *DeRevere v. DeRevere*, 5 Wash. App. 741, 491 P.2d 249, 251–252[3] (1971).

6. *In re Marriage of B.K.S.*, 535 S.W.2d 534, 536[4] (Mo.App.1976); *Conrad v. Bowers*, 533 S.W.2d 614, 620[7] (Mo.App.1975); *In re Marriage of Powers*, supra n.5, 527 S.W.2d at 957[15]; *Reed v. Reed*, 516 S.W.2d 568, 570[5] (Mo.App.1974).

property and granting maintenance orders; appellate courts will neither scour and nit-pick the record for accounting error nor second-guess the trial court's balance of the equities, but will interfere only if the division of property is so heavily and unduly weighted in favor of one party as to amount to an abuse of judicial discretion, or unless the amount of maintenance is patently unwarranted or wholly beyond the means of the spouse who pays maintenance.[7] Our inquiry into the distribution of marital property is whether the division is so disproportionate as to amount to an abuse of discretion or an erroneous application of the law.

As to enumerated consideration (1)—the contribution of each spouse to the acquisition of the marital property, including Sara's contribution as a homemaker—it is evident that each spouse contributed materially and substantially to the acquisition of the marital property accumulated during the nineteen years they lived together. J.C. worked five days a week, sometimes six, as a dentist, and this work, as he described it, is "physical work". Sara worked in the dental office, kept books and attended to her home and children with the assistance of a woman who came in to "clean" once a week. Neither spouse was guilty by any standard of any profligate dissipation of the marital property, and it was not necessary for Sara to prove the value of her contribution on a dollar-per-hour basis. See *Cain v. Cain,* 536 S.W.2d 866, 874 (Mo.App.1976), and *Gaskie v. Gaskie,* 534 P.2d 629, 631[2][3] (Colo. banc 1975).

In considering factor (2) of those specifically listed, we are remitted for the most part to the parties' estimates of value, but of course the parties were competent to give an opinion of the value of their own property, although the trial court was not bound to accept either estimate as exact. *Carnell v. Dairyman's Supply Co.,* 421 S.W.2d 775, 779[9, 10] (Mo.1967); *State ex*

*rel. State Highway Commission v. Northeast Building Co.,* 421 S.W.2d 297, 301[3] (Mo.1967); *In re Marriage of Heddy,* supra, 535 S.W.2d at 280[11][12]. We have described the marital assets in detail. Accepting the most sanguine estimate of the value of the Talbot-General stock, the value of the marital property lies between $241,354 and $220.854. The value of the property apportioned to Sara comes to $60,000, but the property is unsaleable, and the record indicates she may expect to receive $.04 to $.05 per share as a dividend on the Talbot-General stock. This would produce a yearly income of $600.

Turning to factor (3), the economic circumstances of each spouse at the time the property is divided, including the desirability of awarding the family home (or the right to live there for reasonable periods) to the spouse having custody, we find that Sara had no assets except the $300 monthly temporary alimony which J.C. had been paying since 1969. She was living in a one-room basement apartment. At trial time Sara was 52 years of age. J.C. was 56 years old, in good health, practicing dentistry five to six days a week. He has occupied the family residence since he and Sara separated in 1969. He has maintained the home and the children have lived with him. He estimated his living expense to be "$18,000.00 a year, $20,000.00 a year, something like that." J.C.'s federal income tax returns for the years 1971 and 1972 indicate a gross annual income of about $35,000.

The final, specific factor for appraisal is the conduct of the parties during the marriage. § 452.330, subd. 1(4), RSMo Supp.1975. In this connection we have considered Sara's contention that "fault" cannot be considered in apportioning the marital property. She is mistaken. As a general matter, there is no necessary correlation between the elimination of fault as a ground for divorce and the elimination of fault as a relevant consideration in the divi-

7. See, e. g., *Naeger v. Naeger,* 542 S.W.2d 344, 347[6] (Mo.App.1976); *Murray v. Murray,* supra, 538 S.W.2d at 588[4]; *In re Marriage of Heddy,* supra, 535 S.W.2d at 280–281[13]; *In re*

*Marriage of Powers,* supra n.5, 527 S.W.2d at 951; *In re Marriage of Janko,* 533 P.2d 62, 63[2] (Colo.App.1975).

sion of marital property,[8] and when, as in Missouri, the legislative decision has been to retain "fault" or "misconduct" as a factor to be considered in dividing marital property, the courts are not at liberty to disregard that decision. *Conrad v. Bowers,* supra n.6, 533 S.W.2d at 620[6]; *Kretzschmar v. Kretzschmar,* 48 Mich.App. 279, 210 N.W.2d 352, 356–357[2] (1973). Nevertheless, the statute refers to "conduct" of the parties "during" the marriage; as noted in *Conrad v. Bowers,* supra n.6, 533 S.W.2d at 620[6], the noun "conduct" includes both good conduct and marital fault, and we find the preposition "during", properly defined, to mean "throughout the whole continuance of", I Oxford English Dictionary p. 819 (Compact ed. 1971); or "throughout the course or continuance of". Merriam-Webster New International Dictionary p. 801 (1955). Inordinate focus on a particular incident or series of incidents is therefore inappropriate, particularly when the dissolution affects a marriage of long duration; § 452.330, subd. 1(4) was not intended to authorize judicial censure of either party by means of a wholly disproportionate distribution of marital property. *In re Marriage of Neubern,* 535 S.W.2d 499, 502 (Mo.App. 1976); *In re Marriage of Powers,* supra n.5, 527 S.W.2d at 956–957[13, 14].

■ Sara's misconduct, her "fault" in bringing about the separation, is an important circumstance here, but it is by no means controlling. The marriage lasted nearly 19 years; there is no doubt that Sara contributed materially and substantially to the accumulation of the parties' property. Taken most favorably to J.C. and the result reached by the trial court, the record establishes that in 1969 Sara started frequenting bars, staying away from home overnight, and developed an adulterous relationship with a man named Hughes. Several times Sara and J.C. attempted to become reconciled, but those attempts were unsuccessful. Sara has been guilty of misconduct, but her "fault" or misconduct has not been such as to deprive her of her right to share equita-

bly in the marital property. *In re Marriage of Powers,* supra n.5, 527 S.W.2d at 956–957[14].

To recapitulate the evidence touching the four factors enumerated in § 452.330, and at the expense of some repetition, the record shows that the marital property is a product of "team effort", so to speak; J.C.'s cross-examination indicates that what he and Sara accumulated, they accumulated while they "were living together". As noted the trial court found that all the property was marital property, and that finding is in no wise challenged here.

As to factor two, the value of the property set apart to each spouse, our calculation, necessarily imprecise, indicates a marital estate having a net value between $220,854 and $241,354, or a net value between $146,934 and $167,434, depending on the value placed on the Talbot-General stock. Sara has been awarded 12,000 shares of the stock. The Talbot-General stock originally represented an investment of $16,000 for 3,200 shares in 1967. The stock thereafter split seven for one. Assuming a number of things, "continuity of management and everything else along that line", and "apply[ing] a factor of 10 to 12 times earnings", Talbot-General's accountant valued the stock at $5 per share, perhaps $6 per share. However, the testimony of Mr. Robert E. Talbot, Vice President and Treasurer of Talbot-General, indicates the stock cannot be sold, and the evidence of Mr. Gene Schwartz, corporate secretary, indicates the stock has a book value of $1.70. As indicated the corporate audit received in evidence indicates Sara may expect to earn $.04 to $.05 per share on the stock. In short, Sara has received about half of one single marital asset, the value and utility of which is extremely nebulous and open to doubt.

The economic circumstances of each spouse, the third consideration listed in § 452.330, para. 1, stand in stark contrast, as Sara argues. As we have said, Sara has no assets; J.C. has considerable property

8. *Peterson v. Peterson,* 242 N.W.2d 103, 108[4–6][7] (Minn.1976); Clark, Divorce Policy and

Divorce Reform, 42 U.Colo.L.Rev. 403, 410 (1971).

and a gross income of more than $30,000 per year. It must be conceded that J.C. has maintained the family home and that it is desirable to award that home to him, even though it would obviously have been his duty to maintain that home if Sara had not left it.

■ Summed up, the record shows the parties lived together happily or at least compatibly, for 18 years. Sara then began drinking, staying away from home, and eventually began consorting with a paramour. J.C.'s response, we note, was to become emotionally upset to the point of striking his bride of 18 years, the mother of his children. We cannot judicially approve adultery nor the abdication of a spouse's family responsibilities, but Sara's misconduct has not been such as to warrant the grossly disproportionate award of marital property. True, Sara has been granted a maintenance order, but as she argues, the distribution of marital property is final, § 452.330(4), and her economic future and security should not be made dependent upon a single marital asset of problematic value and upon the continuance of J.C.'s good health and earning capability. Such a distribution constitutes a misapplication of the law. Sara has taken some continued interest in the farm in Newton County. The farm is a saleable asset. If Sara is to be turned out of house and home once and for all, she should be awarded some asset of more tangible value than the stock. We hold that the farm should be awarded to Sara, in addition to her share of the Talbot-General stock.

■ There remains the question whether the order granting maintenance can be sustained in light of the requirements of § 452.335. Contrary to Sara's apparent understanding, maintenance under § 452.335 is not the legal equivalent of alimony; maintenance may be awarded to either party upon dissolution of a marriage, but unless the spouse seeking maintenance is the custodian of a child, it must appear that he or she 1) lacks sufficient property, including the marital property apportioned to her to provide for her reasonable needs,

and 2) is unable to support herself through appropriate employment. § 452.335(1)(1) and (2); *In re Marriage of Neubern,* supra, 535 S.W.2d at 503[4, 5]. Nevertheless, the statutory conditions are relative, not absolute, *Casper v. Casper,* 510 S.W.2d 253, 254–255 (Ky.1974), and the spouse seeking maintenance is not required to consume her part of the marital property before being entitled to maintenance. *In re Marriage of Powers,* supra n.5, 527 S.W.2d at 955[10]; *In re Marriage of Eller,* 552 P.2d 30, 31[1] (Colo.App.1976). The most that can be accurately said about the amount to be granted is that it is neither the policy of the law to give the spouse receiving maintenance a lifetime annuity nor to reduce her to menial labor to eke out an existence. See *In re Marriage of Powers,* supra n.5, 527 S.W.2d at 954–956 [9, 10][11][12]; *Casper v. Casper,* supra, 510 S.W.2d at 254–255; *In re Marriage of Kitson,* 17 Or.App. 648, 523 P.2d 575, 578–579 (1974).

■ Sara testified at length concerning her reasonable needs. At trial time she was living in a one-room basement apartment. Her rent was $65 per month. She was driving a 1971 Volkswagen on which she owed $1,100. She was looking for a new apartment because her landlord had sold his property, and she estimated that new living quarters would cost between $125 and $150 per month. She spent $100 per month on groceries, gasoline cost between $25 and $35 per month, and her medicine cost about $40. Her utility bill ran between $30 and $35 per month, her telephone cost $10 per month, and incidentals, including clothing, came to $84. Sara said her "miscellaneous expenses" ran from $100 to $200 per year, and her monthly car payment was $62.12 per month. In response to a direct question, Sara stated that her living expense came to $464 per month, and even at that rate she was unable to keep her current accounts paid.

Does Sara have sufficient property, including marital property apportioned to her, to provide for her reasonable needs? We believe not. Sara has no property other than the marital property apportioned to

her and the productivity of what she has is open to question. Manifestly the dividend she may expect from the Talbot-General stock is insufficient to provide for any person's reasonable needs. There was evidence that the Newton County farm had been acquired as a sort of security, as J.C. put it, "someplace to retire" "should something happen to me", but other evidence indicates that it has been used as a residence for Sara's mother and stepfather, and J.C.'s federal income tax returns suggest that the farm has been used as a tax shelter; at least it has been operated at a net loss for several years. Sara testified that she had done some farm work in the past, but she is now in her middle fifties and her health is uncertain. In our opinion, the farm—in Sara's hands—probably will constitute a marginal enterprise rather than a source of regular income. It may be said, therefore, that the first condition prescribed by § 452.-335 is met even when the farm is apportioned to Sara.

Is Sara employable at an income sufficient to meet her reasonable needs? To determine this question, it is proper to consider her education, training, experience, age, health and the length of her marriage. The length of the marriage is important because the longer the marriage, the less likely it is that the wife can acquire training sufficient to find suitable employment and become completely self-sufficient. From the record it appears that Sara has a high school education. She has been trained as a dental assistant, but she has no professional skill or training. The last time she worked as a dental assistant, she was paid $10 for a nine-hour day. Sara "used to be" a typist, but "can't any more." She has worked as a bookkeeper, but kept books "sort of by guess". She has worked at various types of employment since she and J.C. were separated; she had one traveling job at which she earned between $100 to $125 per week, but was unable to continue in that employment because she didn't feel well. More recently she has been employed as a desk clerk at several Joplin motels, earning from $.75 per hour to $1.60 per hour.

When the trial was had, Sara was 52 years of age. She is a "heart patient" and suffers from hyperglycemia. It is necessary for her to take medicine regularly and see her physician regularly. Her hearing is now impaired, and this impairment has prevented her from becoming an efficient employee. It seems obvious to us that Sara is unlikely to acquire any significant new skills and that her prospects for future regular employment sufficient to meet her reasonable needs are negligible. We bear in mind that Sara and J.C. were married and lived together nearly 19 years, and we consider that the second statutory precondition to a grant of maintenance exists here.

The amount of maintenance awarded— $375 per month—is obviously not sufficient to maintain Sara by itself. However, as indicated, it is not the purpose of an award of maintenance to provide Sara with a comfortable annuity in view of the fact that she can work and earn sufficient money to supplement the award of maintenance. If the parties' financial circumstances change significantly, the award may be modified in a future proceeding. See *In re Marriage of Powers,* supra n.5, 527 S.W.2d at 955–956.

The cause is remanded with directions to the trial court to modify its apportionment of marital property and to apportion the farm, described as the east one-half of the southeast one-quarter (E ½ of SE ¼) in Section 21, Township 27, Range 31 West, Newton County, Missouri, to Sara Schulte as her sole and separate property. In all other respects, the judgment and decree of the trial court is affirmed.

All concur, except TITUS, J., who took no part in the consideration or decision of this case.