Teresa Gail **WESTRICH**,
**Plaintiff-Appellant,**

v.

Clarence Theodore **WESTRICH**,
**Defendant-Respondent.**

No. 13672.

Missouri Court of Appeals,
Southern District,
Division Three.

June 27, 1985.

Motion for Rehearing or Transfer
Denied July 15, 1985.

Application to Transfer Denied
Sept. 10, 1985.

James R. Robison, Sikeston, for plaintiff-appellant.

Clarence Theodore Westrich, Cape Girardeau, acting pro se.

HOGAN, Judge.

This appeal was taken by Teresa Gail Westrich, now Teresa Jansen, from the trial court's refusal to award her an attor-

ney's fee in a proceeding to modify the child custody and support provisions of a decree of dissolution of marriage. It is settled beyond cavil that awarding attorney's fees and allowing expenses of litigation under present § 452.355, RSMo 1978—which applies to this case—is discretionary with the trial court and that its ruling will be reviewed only for an abuse of discretion. *Keefe v. Keefe*, 435 S.W.2d 313, 317 (Mo. 1968); *Orth v. Orth*, 637 S.W.2d 201, 206–207[11–12] (Mo.App.1982); *Budzinski v. Budzinski*, 632 S.W.2d 527, 530–531[9–11] (Mo.App.1982). Being thoroughly convinced that an abuse of discretion has occurred, we reverse and remand.

The parties to this action were married September 22, 1979, and were finally separated March 13, 1980. A male child was born during their marriage on February 14, 1980. The marriage was dissolved by the Circuit Court of Scott County on March 2, 1981. Among other things, the trial court awarded custody of the child to Teresa Gail Westrich, to whom we shall refer as the plaintiff, subject to very specific visitation rights which were set out in the decree. Clarence Theodore Westrich, to whom we shall refer as the defendant, was ordered to pay plaintiff the sum of $195 per month as child support.

This motion to modify was filed April 16, 1982, a little more than a year after the decree of dissolution was entered. The defendant sought modification on the following grounds: 1) at various times, plaintiff had refused to allow defendant his rights of visitation or had unreasonably interfered with those rights; 2) that the defendant's earning capacity had been greatly diminished "due to work related injuries and impairments" and defendant had been without employment since October 1981 and was "without funds whatsoever" to pay the child support ordered by the court. The defendant concluded that "because of the above mentioned change in circumstances" he was able to care for his child and therefore deserved to have "full

custody" of the child, plaintiff to have reasonable rights of visitation; alternatively defendant prayed that the parties share custody as provided by § 452.375, RSMo (Supp.1983),[1] with plaintiff being ordered to pay a reasonable amount of support during the time the child was with defendant. Prayer of the petition ran accordingly.

The plaintiff filed a responsive pleading. That pleading included a prayer for a reasonable attorney's fee covering both plaintiff's opposition to the motion to modify and her efforts to enforce the decree prior to the time the motion to modify was filed. We need not consider the merits of the motion to modify; the trial court refused modification and after several continuances to allow Mr. Westrich to obtain proof, subpoena witnesses or otherwise bolster the allegations of his motion, ordered Westrich to execute an assignment of his earnings to secure compliance with the original order for child support, as authorized by § 452.-350, RSMo (Supp.1983). No appeal was taken from the order denying modification and that order has long been final. The only question at issue is whether the denial of an attorney's fee to the plaintiff was an abuse of discretion. As indicated, we consider it to be such; unfortunately, it is necessary to restate the evidence in some detail to demonstrate the basis for our conclusion.

As noted, this action was commenced on April 16, 1982. A discovery process was initiated and defendant Westrich was served with interrogatories. Several of the interrogatories propounded and the answers given are material on this appeal. Interrogatory # 2 called upon defendant to state whether he was employed and if so, to state the name of his employer. The answer to this interrogatory was: "I am unemployed." Interrogatory # 4 called upon the defendant to specify the injuries or diseases which prevented him from working. The answer to this interrogatory was: "Non-reversible hearing damage going back over a period of several years,

---

1. The "joint custody" provisions of this statute, with which the defendant was much taken, were

not in effect when the motion to modify was filed.

caused and worsened by the noise of locomotives. Cronic [sic] and recuring [sic] Bursitis in the left shoulder and arm. Headache, tension, stress, sleeplessness, mental anguish, depression relating to loss of child and previous court decision in this case, making it impossible to work and function." By Interrogatories # 6 and # 7, defendant was asked to state the names of any institutions where he had savings or checking accounts; the answer to both interrogatories was "none." By Interrogatory # 8, defendant was asked to state whether he had sold any real estate since March 2, 1981, to give a description of that real estate, and the name and address of the person to whom the property was sold. Defendant's answer was "Yes, I transferred my residence, located at 1548 Amblewood in Cape Girardeau, to Mrs. Blandine Westrich, who now resides at that address. She is related to me as my mother. I was paid the amount of [the] equity which I had in the house, which was in the approximate sum of $10,000.00. I have no records of the transfer, and am not certain of the exact date, however, it was approximately one and one-half years ago, and may have even been prior to the second day of March 1981...."

By Interrogatory # 9, the defendant was asked to state each address at which he had lived since the date of the original decree. The response was "Other than the [Cape Girardeau address], I have stayed with various friends and relatives at various times and dates all over the country." By Interrogatory # 14, defendant was asked to state the names and addresses of physicians who had treated him for the disabilities and illnesses which prevented him from working. Plaintiff also asked for authorization to interview the physicians. In response to this interrogatory, defendant stated "I have seen Dr. Felker and Dr. Roberts for my hearing problems, and I have seen Dr. Kasten for the injuries and damage[s] to my shoulder and arm. All of the above physicians are located in Doctor's Park in Cape Girardeau, Missouri. I do not recall the exact dates treatment was received." The authorizations requested were not executed. Interrogatory # 15 requested information about the defendant's termination of his employment by Burlington Northern Railroad Company, specifically, the date his employment was terminated, whether defendant had been terminated at his request or by his employer and the specific reason for termination. The defendant's response to this interrogatory was: "My employment was terminated several months ago. Employment was terminated mutually by my employer and myself, as I was unable to continue to work due to the injuries and damages referred to previously in these Answers to Interrogatories."

It is of interest that while this discovery process was going on, plaintiff moved the court for an order compelling defendant to appear for examination as provided by § 513.380, RSMo 1978. The plaintiff averred that defendant had failed to pay child support as ordered and had failed to pay $609.19 of the $1,500 attorney's fee awarded as part of the original decree. The plaintiff further averred that child support in the amount of $2,145 was due and delinquent through the month of April 1982. It was further alleged that two writs of execution and garnishments in aid thereof had issued to defendant's employer; that upon the return date the writs had been returned only partially satisfied, and that the plaintiff had been unable to discover any property upon which to levy a writ of execution.

In response to this motion, the trial court cited defendant to appear for examination as provided by § 513.380, RSMo 1978. The citation was returned non est by the Sheriff of Cape Girardeau County.

The cause finally came on for hearing before the court on May 13, 1983. Counsel for the defendant requested that defendant be allowed to participate in direct examination, cross-examination and "perhaps in closing argument." The defendant, apparently on his own initiative, had prepared a "joint" or "shared" custody agreement. This agreement was not received in evidence nor seriously considered by the trial

court, but in substance it would have required the parties to exchange custody each week and would have required both parties to share the cost of child support by establishing and maintaining a joint checking account and by depositing therein an amount sufficient to care for the child's needs, to be agreed upon. We mention the agreement only because the defendant brought it to the trial court's attention several times and because it illustrates the defendant's deep-seated ambivalence toward the child.

The defendant began his testimony on direct examination as follows:

"And you were also by [the decree of dissolution] ordered to make certain payments of support?

A. Yes.

Q. Namely, $195 per month commencing the 1st of March, 1981?

A. Yes.

Q. And the rest of the decree, of course, speaks for itself. It's part of the court file. At that time, sir, were you employed?

A. At that time, I was. Yes.

Q. Where were you employed at that time?

A. The Frisco Railroad.

Q. And was that knowledge brought before the Court?

A. As best I remember, it was. I—

Q. In making the determination for the award and support?

A. I suppose it was.

Q. And what, approximately, were you making at that time?

A. My income varies a lot.

Q. At that time.

A. I don't know. I think there was the—I think somewhere around $20,000.

Q. Okay. It'd be fair to say between $20,000 and $25,000?

A. Possibly.

Q. All right. Are you presently employed?

A. I am not working, no.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. All right. And I think you lost your employment some time in the latter part of 1981?

A. Yes.

Q. That was subsequent to the divorce?

A. Yes.

Q. And are you presently employed?

A. I am not working, no."

The defendant went on to testify that he was not working because of "[c]ertain physical impairments, certain physical disabilities relat[ed] to the railroad work." Defendant produced a letter of the "to whom it may concern" variety written by a practicing physician whose office is in Cape Girardeau. This letter was excluded as hearsay, which it was, and the defendant produced no other evidence—aside from his own testimony—that he was disabled in any degree. At trial time, May 13, 1983, the defendant had made only two voluntary payments of child support, although he "thought" there was a garnishment by which another payment had been obtained.

On cross-examination, the defendant was closely questioned about several matters of particular interest to this court:

1) The defendant was asked about his income for the years 1981, 1982 and 1983. It would serve no useful purpose to restate the defendant's evasive answers in detail. Defendant did testify that he prepared his own income tax returns, and that he believed he had copies of his returns at his residence. At the noon recess, the trial court took extra time to allow defendant to check his personal records at Cape Girardeau. The defendant was unable to find his income tax records for 1980, 1981 or 1982. At the close of the hearing, upon motion of plaintiff's counsel, the defendant was instructed to obtain copies of his federal income tax returns for the years 1980, 1981 and 1982. Defendant was allowed a period of several weeks—until July 8, 1983—to obtain copies of those returns from the Internal Revenue Service. The defendant did not have the returns on July 8, and did not produce them at that time. The court thereupon ordered defendant to exe-

cute a power of attorney so the lawyer who represented him on trial could obtain the returns from IRS.

Finally, on January 27, 1984, the court reconvened and took time to consider the income tax returns. Defendant's return for the calendar year 1981 indicated that he had an adjusted gross income of $18,912. For the calendar year 1982, defendant had an adjusted gross income of $18,082. Interrogatories directed to the defendant's employer and made of record indicate that during 1983, defendant was employed by Burlington Northern Railroad Company and was paid $19,505.90 in wages to December 3, 1983. The defendant was asked about the discrepancy between his testimony and the record evidence. To explain his failure to make voluntary payments, defendant stated, in part: "... In my opinion, it was for Mr. Robison to see if I would stick around [home] and to see if I had any income. He could also bill his attorney fee that way." Finally, the trial court ordered defendant to execute an assignment of earnings, as permitted by § 452.350, RSMo (Supp.1983), but denied plaintiff any attorney's fees.

2) As noted, one ground advanced by the defendant for modification of the decree was that his earnings and income had been decreased. On cross-examination, it was developed that the defendant had gone to California in 1981. Defendant did not remember, or was unwilling to state, where he had been; he had spent some time "[i]n southern California"; he "stayed with friends out there." He sent no money home for child support because "[He] wasn't working." On another occasion, the date of which he could not recall, the defendant had gone to Canada with a friend, Homer Barnes. The cost of the trip was borne by Mr. Barnes, who was on vacation. The defendant was unable to recall how long he had been in Canada, or the place to which he had gone. He had been unable to pay child support during that period because he was not working.

3) In connection with his financial resources, defendant was asked about the dwelling which he occupied in Cape Girardeau. The defendant had sold his house—or his equity in it—to his mother, for $10,000. Defendant was then asked:

"Q. Now, was that the $10,000 you claimed you lost gambling in Las Vegas?

A. I lost that, yes.

*     *     *     *     *     *

Q. About when did you do that?

A. It was sometime after the sale of the dwelling. I don't recall the exact time."

The defendant also sold his automobile; upon being asked if he had systematically disposed of all of his assets to put them beyond the reach of an execution for child support, defendant answered: "I sold property, legally, honestly and legitimately."

4) As noted, the defendant exhibited a deep-seated ambivalence toward the minor child. It is obvious on the face of the record that the child was conceived out of wedlock; it clearly appears from the legal file that the defendant denied paternity of the child during the trial of the dissolution action. It also appears clearly that after the motion to modify was filed, the defendant continued to deny paternity. Certain parts of a pretrial deposition given by the defendant before trial of the motion to modify were read in evidence. They are material on this appeal. The defendant was asked if he now "claimed to be the father of [the child]." Defendant answered: "I am not denying or claiming anything." The interrogation proceeded as follows:

"Q. That is, you are strictly neutral on the subject of whether you are or are not?

A. I can love a child whether he is mine or not. People adopt children that are not theirs. They love them like their own.

Q. But you are not taking an affirmative position here today that you are the father of [the child] are you?

A. I would still like to have some blood tests.

*     *     *     *     *     *

Q. Is that because you have some doubt in your mind whether you are his father?

A. There was doubt at the time of the divorce and I think the blood tests should be taken."

Upon trial, defendant would only state that the questions and answers were accurate "If that's what the deposition [states]." It is to be borne in mind that this testimony was given in the face of a motion requesting that the parties share joint custody of the child, contribute equally to his support, and confer regularly about the child's needs and progress.

The plaintiff testified that there had been some difficulty about the defendant's rights of visitation, but her testimony, construed most strongly against her, was simply that the defendant had sought to exercise his rights of visitation only sporadically and had, on occasion, been unreasonable in insisting upon taking the child when the child was ill. At trial time, plaintiff was employed by what she called a "federal coop" which provided special services for several school districts. Plaintiff's "take-home" pay was $760 per month. She testified that she had provided all the support for the child and that she intended to continue to do so. At the time of trial, the plaintiff had received only two payments for support—a total of $390.

The plaintiff's husband, Alphonse Jansen, testified that he was a self-employed carpenter. He earned about $9,000 per year.

The defendant has filed his own brief and, in fact, argued his points before this court at the time the appeal was submitted. The substance of his brief and argument is that an allowance of an attorney's fee in this case lies in the discretion of the trial court, which is correct, and that no abuse of discretion has been shown, a proposition with which we cannot agree. Neither can we agree with his argument that there is no record basis for the assessment of a reasonable attorney's fee.

The evidence has been recited at length, not to emphasize the bizarre conduct of the defendant, but only to show that there has been an abuse of discretion in this case. It may be that the defendant believes he is not the natural father of the child, but the issue of paternity, if there is an issue, is beside the point. Even assuming that the ordinary principles of issue preclusion do not apply, the child was born while the plaintiff was married to the defendant. The defendant is therefore the "legal" father of the child, even though he may not be its natural father. *In the Matter of C___ W___ B___*, 578 S.W.2d 610, 614[3] (Mo.App.1979).

The allowance of attorney's fees in domestic relations cases is controlled by statute in this State, as it is in most jurisdictions.[2] Although it may be said there is considerable conflict in the precedents and that many of the decisions turn upon the precise language of the applicable statute, there is general agreement that when a wife is obliged to bring suit to enforce a child support order, the husband must pay her attorney's fees.[3] In this jurisdiction, the allowance of counsel fees is controlled by the language of § 452.355, RSMo 1978, which reads:

"The court from time to time after considering all relevant factors including the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under sections 452.300 to 452.415 *and for attorney's fees, including sums for*

---

**2.** See, generally, Clark, Domestic Relations, § 14.2, pp. 428–431 (1968); Note, Counsel Fees in Matrimonial Actions, 38 Neb.L.R. 761 (1959).

**3.** *Scholla v. Scholla*, 201 F.2d 211, 214[7, 8] (1953), cert. denied, 345 U.S. 966, 73 S.Ct. 951, 97 L.Ed. 1384 (1953); *Keith v. Paden*, 255 Ala. 294, 51 So.2d 9, 12[8, 9] (1951); *Ginter v. Ginter*, 305 Ky. 513, 204 S.W.2d 596, 597[3, 4] (1947); Clark, Domestic Relations § 14.2, p. 430.

*legal services rendered* and costs incurred *prior to the commencement of the proceeding or after entry of judgment.* The court may order that the amount be paid directly to the attorney, who may enforce the order in his name." (Our emphasis.)

This statute was obviously taken from § 313 of the Uniform Marriage and Divorce Act, which reads:

"The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this Act and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name."

9A U.L.A., p. 177 (1979). The Official Comment to this section, 9A U.L.A., 177–178, reads:

"The purpose of this section is to authorize the payment of costs and a reasonable fee by one party to the other party's attorney if the court, after considering the financial resources available to both parties, determines the order to be necessary. The section extends authority to make several orders for costs and fees at different stages of the proceedings, and permits an attorney to enforce the order directly."

A comparison of § 313 of the Uniform Act with § 452.355 shows that § 313 extends the discretionary power of a trial court to allow attorney's fees in domestic relations litigation by providing that an allowance may be made for legal services rendered both prior to the commencement of an action or after the entry of a judgment. This provision seems to have been drafted to eliminate conflict in the case law. See Clark, Domestic Relations, pp. 430–431. However, when the General Assembly enacted § 452.355, Laws of Mo. 1973, p. 477, it did not restrict the trial court's consideration to the financial resources of the parties, but mandated that the court consider "all relevant factors." So, it has been held that the need of a party is but one factor to be considered in awarding attorney's fees, and an allowance may be made even though need is not established. *Beckman v. Beckman*, 545 S.W.2d 300, 302–303[8] (Mo.App.1976).

■ We do not suggest that an award of attorney's fees should be employed as a punitive device; we do believe, and hold, that a husband's deliberate refusal to comply with an order for child support and his attempt to frustrate enforcement of that order are "relevant circumstances." We also realize that if reasonable men could differ as to the propriety of an action taken by the trial court, there has been no abuse of discretion. *Shirrell v. Missouri Edison Co.*, 535 S.W.2d 446, 448–449[2] (Mo.banc 1976); *James v. Turilli*, 473 S.W.2d 757, 763 (Mo.App.1971). We are likewise aware that in reviewing court-tried cases, we may not set aside the judgment or decree as being against the weight of the evidence unless the record generates a firm belief that the decree or judgment is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ Nevertheless, our examination of the record convinces us that reasonable minds could not differ as to the propriety of the trial court's action and we are convinced that denial of an attorney's fee was wrong. Assuming as we must that the defendant's actions were rational, the conclusion is irresistible that the defendant has done everything in his power to avoid payment of the child support originally decreed, and that there is no reasonable ground for his failure to do so.

The defendant asserts, of course, that there is no evidence upon which to base an award of attorney's fees, but he is mistaken. The plaintiff's attorney testified that

he had spent 28 hours at $75 per hour attempting to enforce the decree and in preparing for the trial of the motion. This would amount to $2,100, including futile action taken trying to enforce the decree and time spent developing the merits of the defendant's position on the motion to modify. Given the abuse of discretion which this court finds, this court is qualified to determine the reasonable value of the legal services rendered. *Kays v. Curtis,* 648 S.W.2d 901, 903 (Mo.App.1983); *Fisher v. Peterson,* 240 S.W.2d 176, 179[4–6] (Mo. App.1951). There is ample evidence in the record to justify the amount of the attorney's fee claimed.

Accordingly, the order denying plaintiff an attorney's fee is reversed and the cause is remanded with directions to enter an order allowing plaintiff the sum of $2,100 as attorney's fees, to be paid directly to plaintiff's attorney.

CROW, P.J., and TITUS and MAUS, JJ., concur.