In re Marriage of REED.

William C. REED, Petitioner,

v.

Bobbie J. REED, Respondent.

Nos. 15366, 15378.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 28, 1988.

C. Ronald Baird, Dorr, Baird and Lightner, P.C., Springfield, for petitioner.

Loren R. Honecker, Sherwood, Honecker & Bender, Springfield, for respondent.

HOGAN, Judge.

These appeals are taken from the classification and distribution of property, the award of maintenance and the refusal to award attorneys' fees in an action for dissolution of marriage.

Appeal No. 15366 is respondent Bobbie J. Reed's appeal. The substantive and dispositive questions presented on Bobbie's appeal are: 1) whether the trial court erred in classifying William Reed's professional corporation as separate property, and 2) whether the trial court abused its discretion in refusing to award Bobbie attorneys' fees.

Appeal No. 15378 is petitioner William Reed's appeal. The essential and determinative question presented on William's ap-

peal is whether the trial court erred in awarding Bobbie the sum of $1,000 per month as maintenance for an indefinite time. Other points have been briefed and they will be noted, but the essential issues are those we have just stated.

The standard of review governing the appeal is that declared in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976). We must sustain the trial court's decree unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law or unless it erroneously applies the law. *Hoffmann v. Hoffmann*, 676 S.W.2d 817, 822[1] (Mo.banc 1984); *Sturgis v. Sturgis*, 663 S.W.2d 375, 379 (Mo.App. 1983).

The parties to this action are mature, well-educated persons. At the time of trial, William was 56 years of age and had been engaged in the practice of podiatry for some 26 years.[1] Bobbie was 52 years of age at trial time. She has completed three years of college study, working toward a degree in business administration. She has also been employed as a clerk in an elementary school, has worked as a secretary and has taught typing at a vocational school at night. The parties have both been married before; both have grown children.

William practiced podiatry in Chicago for approximately 10 years. In 1968, he left Chicago and located in Springfield, Missouri, where he continued to practice his profession. William's first marriage was dissolved in 1973.

William and Bobbie were introduced at some sort of religious seminar in 1976. About 6 months after they became acquainted, they were married in the State of Washington. Thereafter, they established a residence at Elkland, in Webster County.

William continued to practice podiatry in Springfield. Bobbie kept house at Elkland. In 1980, William had to discharge an unsatisfactory employee, and Bobbie went to work in his office. William maintained that Bobbie was not a very competent bookkeeper, but in any event Bobbie worked in William's office from 1980 to 1984, at which time William discharged her. During the time she worked in William's office, Bobbie was quite handsomely compensated. William maintained Bobbie was unreasonably jealous of other female employees, particularly Carla Kennedy. Bobbie acknowledged that she and William had a good many marital differences, but maintained that their marriage broke down because William "started having an affair" with Carla Kennedy.

If the parties' marriage was not a happy marriage, it was, by community standards, a very prosperous one. The parties acquired real estate, automobiles and other assets valued at $274,267. The trial court's decree classifying and distributing the parties' property is attached as an appendix.

### I

#### (a)

We have first to consider whether the trial court erred in classifying William's stock in his professional corporation as separate property. Bobbie also maintains that the division of marital property was so heavily and unduly weighted in William's favor as to constitute an abuse of discretion, but for reasons which will presently become clear, that point cannot be reached on this appeal.

William's counsel specifically requested findings of fact determining that all the shares of stock in William's professional corporation were his separate property. The court's finding was as follows:

1. William described podiatry as " ... the art of medicine that treats all the disease and deformities of the foot." The practice of podiatry, or chiropody, as it is sometimes called, is regulated by statute. *See* Chapter 330, RSMo 1986. Section 330.010.2 provides that "The definitions of the words "chiropodist" and "podiatrist" ... shall ... be held to be the diagnosis, medical,

physical, or surgical treatment of the ailments of the human foot, with the exception of administration of general anesthetics, or amputation of the foot.... The use of such drugs and medicines in the treatment of ailments of the human foot shall not include the treatment of any systemic diseases."

"1. The court finds that all stock in the corporation known as William C. Reed, D.P.M., P.C. is non-marital property of the petitioner because he was practicing podiatry before this marriage, *owned all the assets transferred into the corporation in exchange for stock,* he was the only key employee of the company who made it grow, [and] his wife was fully compensated during the time of the marriage for her employment and work in connection with said business from late 1980 to 1984." (Emphasis supplied.)

We direct our attention specifically to the finding that William "owned all the assets transferred into the corporation in exchange for stock." We take this finding as an adjudication that the assets which William transferred for stock in the professional corporation were separate or non-marital property. Our inquiry, therefore, is whether William had proof which would warrant such a conclusion.

### (b)

It is conceded that William Reed had a podiatric practice before he married Bobbie. William attended the Illinois College of Surgery in Chicago, Illinois, from 1954 to 1958. He then entered practice in Chicago, and he remained in Chicago until 1968. William then sold his practice and moved to Springfield, where he set up an office at 837 South Glenstone Avenue. William was divorced in 1973, and he "receive[d] the assets of the podiatry practice." From 1968 to 1981 William conducted his practice as a sole proprietorship. He used his earnings "to live on" and as operating capital for his business.

In 1981, William incorporated his practice. He testified that only business assets were transferred to the corporation in exchange for stock at that time. The transfer, or more properly, exchange of assets, was a so-called "351 stock transfer." [2] Although we have none of the details of the incorporation before us, the name of William's corporation is William C. Reed, D.P.M., P.C., and the corporation does business under the name "Foot Clinic of Springfield." William testified that he was at all times the corporation's sole shareholder. The corporation's initial tax return, before us as respondent's exhibit F, covers the period from December 24, 1981, to September 30, 1982 (the corporation's first fiscal year) and indicates that the value of the common stock is $11,000. This return also indicates the corporation owned a building valued at $9,193, an x-ray processor purchased for $2,400 and furniture and fixtures acquired at a cost of $29,686. However, and to reiterate, no corporate records were offered in evidence.

It is apparent from William's description of his practice that various instruments and machines are used, and that the services he renders are a specialized form of medical service. To illustrate, William testified that he ordinarily conducted his practice with the assistance of three employees. One was a phlebotomist and "nursing lab person." This employee "draws blood and sets up appointments and scrubs in with [William], and sterilizes the instruments, and draws up injections, and treats the patient with ... physical modalities like with—take x-rays, plus ultrasound and diathermy and those particular things." The second employee is a licensed practical nurse; she performs duties which are very similar to those performed by the first employee. A third employee keeps medical records, attends to insurance claims and acts as a receptionist.

There was also evidence that a house and lot at 608 South Pickwick in Springfield was purchased by the parties so William would have a place to conduct his practice. This house on Pickwick has been converted from a residence to a business office. All in all, the evidence shows unmistakably that William's "business" requires a considerable investment in quarters and equipment.

---

**2.** We assume this refers to I.R.C. § 351, which provides (or provided) that no gain or loss will be recognized to the person transferring assets to the corporation in exchange for stock, provided that immediately after the transfer they own at least 80 percent of the stock of the corporation. *See* R. Griffith and S. Mukai, Professional Corporations, 27 J.Mo.Bar 118, 119–20 (1971).

**(c)**

Since Missouri adopted its version of the Uniform Marriage and Divorce Act in 1973, Laws of Mo.1973, H.B. 315, it has been required that in a dissolution proceeding, the trial court "... set apart to each spouse his property and ... divide the marital property in such proportions as the court deems just...." Section 452.330, RSMo 1986.[3] Section 452.330 has been the subject of much discussion, and we deliberately forego any general discourse upon the subject of property division in a dissolution proceeding.[4] The initial question before us is whether the trial court erroneously classified William's professional corporation as separate property, and in resolving this question, we must look first to § 452.330.2 and § 452.330.3, which state:

"2. For purposes of sections 452.300 to 452.415 only, *'marital property' means all property acquired by either spouse subsequent to the marriage except:*

(1) Property acquired by gift, bequest, devise, or descent;

(2) *Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;*

(3) Property acquired by a spouse after a decree of legal separation;

(4) Property excluded by valid agreement of the parties; and

(5) The increase in value of property acquired prior to the marriage.

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of coownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property. Each spouse has a common ownership in marital property which vests not later than the time of commencement by one spouse against the other of an action in which a final decree is entered for dissolution of the marriage or legal separation, the extent of the vested interest to be determined and finalized by the court pursuant to this chapter. *The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2."* (Emphasis added.)

■ Sections 452.330.2 and 452.330.3 create a presumption that all property acquired by either spouse subsequent to the marriage is marital property, and the party attacking this presumption has the burden to show that property he claims as separate property falls within one of the enumerated statutory exceptions. *Searcy v. Searcy,* 658 S.W.2d 931, 933–34[2] (Mo.App.1983); *Hull v. Hull,* 591 S.W.2d 376, 379[3, 4] (Mo.App.1979); *Jaeger v. Jaeger,* 547 S.W. 2d 207, 210[2] (Mo.App.1977). The statutory presumption must be rebutted by clear and convincing evidence. *McDowell v. McDowell,* 670 S.W.2d 518, 523[12] (Mo. App.1984); *Conrad v. Bowers,* 533 S.W.2d 614, 622 (Mo.App.1975).[5] William's trial theory was that he acquired all the stock in his professional corporation *in exchange for separate property.* As noted, the question is whether he established, by clear and convincing proof, that the assets he exchanged for stock were not marital property.

**(d)**

■ What evidence did William have that the stock in his professional corpora-

---

3. References to statutes and rules are to RSMo 1986 and V.A.M.R., except where otherwise specifically noted.

4. *See generally,* J. Krauskopf, The Transmutation and Source of Funds Rules in Division of Marital Property, 50 Mo.L.Rev. 759 (1985); J. Krauskopf, Marital Property at Marriage Dissolution, 43 Mo.L.Rev. 157 (1978).

5. In those jurisdictions which have enacted statutes distinguishing marital and separate property and which provide that property acquired in exchange for separate or nonmarital property is itself separate, it is generally held that the burden is upon the party who seeks to avoid marital treatment to prove the exchange. L. Golden, Equitable Distribution of Property § 5.28, pp. 124–25 (1983).

tion was acquired with separate assets? As far as we can determine from the record, he had only conclusional statements to that effect. William, or his counsel, referred to his practice as his "business" and in the course of explaining the character of the corporation, William testified:

\* \* \* \* \* \*

"Q. Did you transfer any assets of the business in exchange for stock?

A. Yes.

Q. Whose name is the stock held in?

A. My name.

Q. Has your wife's name ever been on that stock?

A. No.

Q. When you transferred in the assets from the sole proprietorship to the corporation, were any of her assets included in that transfer or were those just the business assets?

A. Just the business assets.

Q. And those had been accumulated by you during the—during the operation of the business?

A. Yes, just by me."

\* \* \* \* \* \*

William had a similar conclusional statement from an accountant which was admitted by stipulation. The insuperable difficulty with William's proof that the stock in the professional corporation was exchanged for separate property is that there is no proof of the nature or method of acquisition of the assets he exchanged for stock, nor any proof of the time when the assets were acquired. It is true that William practiced podiatry before he was married to Bobbie, and it may be true that no part of the increase in value of the corporation's stock is attributable to uncompensated marital effort on Bobbie's part, but there is no record basis for a finding or an inference that William "owned all the assets transferred into the corporation for stock."

William practiced podiatry for five years after he married Bobbie. Unless the assets he exchanged for stock are the selfsame items he brought into the marriage in 1976, the corporate stock is not property ac-

quired in exchange for separate property. The record suggests it was not. William testified he "used the earnings" of his practice to "operate the business." It is difficult to believe and one certainly could not infer that none of the assets of William's practice were acquired or replaced between 1976 and 1981. Even though the podiatric practice which William had in 1976 was separate property, his income from the practice was marital property in which Bobbie was entitled to share. *Hoffmann v. Hoffmann,* 676 S.W.2d at 825; *Norman v. Norman,* 604 S.W.2d 680, 683 (Mo.App.1980). Moreover, under the source of funds rule adopted in *Hoffmann,* the character of the property is determined by the source of funds financing the purchase; the property is considered to be acquired as it is paid for so that a part of the property's ultimate value will be marital property. *Hoffmann v. Hoffmann,* 676 S.W.2d at 824.

We have found only a few cases from this jurisdiction which address the sufficiency of particular proof to show that property acquired during marriage is separate property. In *Milde v. Milde,* 723 S.W. 2d 471 (Mo.App.1986), the husband exchanged an existing partnership interest in a dairy for shares of stock in a closely-held corporation. Upon dissolution, the corporate stock was held to be the husband's separate property. The origin and nature of the husband's partnership interest, from our reading of the report, was considerably more detailed and specific than the proof adduced by William in the case at hand.

In *Searcy v. Searcy,* 658 S.W.2d 931, there was controversy on appeal concerning the character of a certificate of deposit, various chattels, some TWA bonds and some shares of stock in Kansas City Power & Light Company. The court observed:

"... Although the record, e.g. testimony of the husband that during the course of the marriage he liquidated the bulk of the separate property which he had acquired prior to the marriage, *suggests* that he used the funds obtained thereby to acquire the property in question, it stopped short of rebutting the presump-

tion that the property in question, since it was acquired subsequent to the marriage, was marital property...."

*Id.* at 934[3]. The evidence in *Searcy* was no more indirect and obtuse than William's testimony concerning the assets which he exchanged for corporate stock. We are also cited to *In re Marriage of Powers*, 527 S.W.2d 949 (Mo.App.1975), wherein the husband argued that stock he owned in his corporation was separate property. The court held that the husband had failed to rebut the presumption that his stock in the company was marital, rather than separate property. We do not purport to say what quantum of proof was necessary to show that the assets William exchanged for his corporate shares were separate property. We merely say that the conclusional statements offered as proof that the corporate shares were separate property did not constitute the clear and convincing evidence necessary to rebut the presumption that the corporate shares were marital assets. There was no substantial evidence to support the trial court's finding that all shares of stock in the professional corporation were William's separate property.

(e)

As indicated, Bobbie suggests that the apportionment of marital assets was so grossly disproportionate as to amount to an abuse of discretion, but we cannot reach that point on this appeal. If no further adjudication were required, we could dispose of the cause on its merits as provided by Rule 84.14. *See In re Marriage of Herr*, 705 S.W.2d 619, 621 (Mo.App.1986). Without a determination of the nature of the professional corporation, however, and a valuation of the corporation if the stock is determined to be marital property, one cannot know if the division of marital property is fair and equitable.

We bear in mind that tracing assets is a difficult process, but William surely must have maintained some order of corporate records, and we therefore consider it proper to remand the cause to give him an opportunity to present additional evidence to rebut the presumption that the corporate stock was marital property. *Searcy v. Se-*

*arcy*, 658 S.W.2d at 934; *Household Finance Company, Inc. v. Watson*, 522 S.W.2d 111, 116[15] (Mo.App.1975). Moreover, *if* the corporation is determined to be marital property, it must be valued according to the principles laid down by our Supreme Court in *Hanson v. Hanson*, 738 S.W.2d 429 (Mo.banc 1987) and *Taylor v. Taylor*, 736 S.W.2d 388 (Mo.banc 1987). We are aware that two experts valued the corporation and testified at the trial. The trial court was requested to make a finding of the value of the corporate stock, but only if it was determined to be marital property. Inasmuch as the stock was found to be separate property, no conclusion as to its value was reached. We realize that opinions of the value of the professional corporation were received in evidence, but as far as we can ascertain, the valuation took no account of the "goodwill" or "going concern value" discussed in *Hanson*.

William's expert stated that the value of the corporation was "book value" plus a shareholder loan for a total value of $154,-324. This expert, a reputable and experienced accountant, testified in effect that the corporation had no "going concern" or "goodwill" value. If this were the only testimony, the factual situation would be much similar to that presented in *Taylor v. Taylor*, 736 S.W.2d at 390, and we could set consideration of goodwill aside. William, however, testified to the existence of a "going concern" component in the value of his practice. William was asked if he were going to sell his practice, what percentage of that practice would be transferable to another doctor. He replied "no guarantee," but gave as his opinion that he would say "40 percent or something like that." "Goodwill" and "going concern value" are synonymous in determining the value of a professional corporation. *Hanson*, 738 S.W.2d at 437. It was, of course, held in *Hanson* that "goodwill" may exist even though the practitioner is a solo practitioner, *Hanson*, 738 S.W.2d at 435, and if the trial court finds that "goodwill" exists and is an asset of William's professional corporation, then the value of that goodwill

must be determined by ascertaining the price the professional practice would bring were it sold on the open, relevant market to a qualified professional. *In re Marriage of Brooks*, 742 S.W.2d 585, 589–90 (Mo.App. 1987).

We must also bear in mind that Bobbie produced an expert, a Mr. DeHaven. Mr. DeHaven valued the professional corporation at $265,000 and believed the corporation had some "marketability" which we take to mean that the corporation had some value as a going concern. Without dwelling endlessly on the matter, we believe the trial court should, on remand, hear such further evidence as the parties have to present touching the character of the professional corporation as separate or marital property. If the corporation is determined to be marital property, the trial court should determine whether it has value as a going concern. If it be determined that "goodwill" is a component of the corporation's value, then that component must be valued as *Hanson* prescribes.

## II

A further point for consideration on Bobbie's appeal is her argument that the trial court erred and abused its discretion in refusing to make an award of attorneys' fees because such an award was fully justified in that there is substantial disparity in the parties' means and Bobbie's attorneys' fees were substantially occasioned by William's misconduct.

Counsel's theory has considerably outrun the record before us. During the course of her testimony, Bobbie identified three statements of account. The first was a bill in the amount of $260 for accounting services, submitted to a legal firm which has offices in Marshfield. The second was a statement in the amount of $2,500 for services rendered by the Marshfield law firm. This second statement shows that $2,500 was originally due and $2,000 had been paid. Bobbie also presented a bill from a Springfield firm in the amount of $16,746. This statement was offered as respondent's exhibit BB, but it is not before this court. William did not admit that the charges

were fair and reasonable. There is further evidence that Bobbie originally retained the Marshfield attorneys, became dissatisfied with their services, discharged them and employed a Springfield firm.

As we understand Bobbie's appellate counsel, his assertion in this court is that we should hold there was an abuse of discretion in refusing to order William to pay $17,506 in attorneys' fees on Bobbie's behalf, without any showing of the hourly rate charged or the amount of time involved, and without any concession from opposing counsel that the charges are fair and reasonable. A trial court's ruling on an award of attorneys' fees is presumptively correct, and Bobbie has the burden of showing an abuse of discretion in making the ruling. *S.R. v. S.M.R.*, 709 S.W.2d 910, 916 (Mo.App.1986); *Golleher v. Golleher*, 697 S.W.2d 547, 550 (Mo.App.1985). This court has held that when there is an abuse of discretion, it is qualified to determine the reasonable value of the legal services rendered. *Westrich v. Westrich*, 694 S.W. 2d 873, 879–80[3] (Mo.App.1985), 57 A.L. R.4th 697 (1985). This does not mean, however, that we may conjure up a figure which would be proper, especially where several lawyers were involved, in the total absence of evidence of the services actually rendered. The amount of the fee must be reasonable, and the services rendered must have been reasonably necessary to the conduct of the spouse's case. 2 H. Clark, Domestic Relations § 17.2, p. 235 (1987). Since the cause must be remanded, the issue of an award of attorneys' fees may be reconsidered by the trial court upon proof of the services actually rendered by the several attorneys involved.

## III

William's appeal is directed to the trial court's order allowing Bobbie maintenance in the amount of $1,000 per month for an indefinite period of time. Somewhat paraphrased, William's contentions are that Bobbie failed to establish the statutory conditions precedent to an award of maintenance; the award of maintenance is excessive, and the court should have limited the

award of maintenance to a period of not more than two years.

The trial court's finding concerning maintenance was as follows:

"4. The court finds that Respondent is entitled to periodic maintenance because her health and age restrict her employment so that she is unable to support herself through appropriate employment, because Respondent is unable to obtain insurance coverage for her heart condition due to Petitioner allowing such coverage to lapse, because the parties have been married for ten years and because of the respective earning potential of the parties."

William's first point, in substance, is that Bobbie did not establish a right to maintenance in any amount. As he argues, a spouse seeking maintenance in a dissolution proceeding must establish both that he (or she) lacks sufficient property to provide for his reasonable needs, *and* is unable to provide such support through employment or because of custodial duties. Section 452.335.1; *Brown v. Brown*, 673 S.W.2d 113, 115 (Mo.App.1984); *In re Marriage of K.B.*, 648 S.W.2d 201, 205[3] (Mo.App.1983). Nevertheless the consistent judicial construction of § 452.335 since its enactment has been that a wife is not obliged to consume her apportioned share of marital property in order to be entitled to an award of maintenance. *Ingebritson v. Ingebritson*, 677 S.W.2d 924, 926 (Mo.App.1984); *Fausett v. Fausett*, 661 S.W.2d 614, 617 (Mo.App.1983); *In re Marriage of Schulte*, 546 S.W.2d 41, 49 (Mo.App.1977); *In re Marriage of Powers*, 527 S.W.2d at 955. Section 452.335.2 further provides that the maintenance order shall be in such amounts and for such period of time as the court deems just and directs the court to consider "all relevant factors" including seven enumerated factors. Judicial construction of this statute has made it plain that the enumerated factors are not exclusive. *Toomey v. Toomey*, 636 S.W.2d 313, 316 (Mo.banc 1982); *cert. denied*, 459 U.S. 1106, 103 S.Ct. 730, 74 L.Ed.2d 955 (1983); *Brown v. Brown*, 673 S.W.2d at 116. So, in general, it is true to say that a trial court is vested with considerable discretion in granting maintenance orders and our appellate courts have interfered with awards of maintenance only when the order is patently unwarranted or is wholly beyond the means of the spouse who pays maintenance. *In re Marriage of Schulte*, 546 S.W.2d at 47 and cases cited n. 7.

William's arguments against the award of maintenance include the contention that proper investment of Bobbie's assets at an 8 percent rate of return would produce an income of $8,000 annually. He further maintains that this income coupled with Bobbie's earnings from a "flea market" and rental property assigned to her would be sufficient to provide for Bobbie's needs and therefore, an award of maintenance was not justified. It is also argued that Bobbie has exaggerated her reasonable needs, which she estimated to be $2,666 per month. We have considered these arguments, but they do not persuade us that the trial court erred in awarding maintenance.

It has been observed that ill health or physical disability which adversely affects the ability to support oneself is consistently recognized as a relevant factor in awarding maintenance.[6] This court has recognized on more than one occasion that a gross and permanent disparity between the parties' capacity to work and earn is a sound reason for an award of maintenance or a disproportionate award of income-producing property so as to accommodate the needs of the parties. *In re Marriage of Jadwin*, 671 S.W.2d 9, 10 (Mo.App.1984); *In re Marriage of Harrison*, 657 S.W.2d 366, 370[4, 5] (Mo.App.1983). When Bobbie's needs and the relative earning capacity of the parties are considered, we believe the award of maintenance is justified.

Bobbie had some education and work experience, to be sure. It cannot be said that she had no marketable skills.

6. J. Krauskopf, Maintenance: A Decade of Development, 50 Mo.L.Rev. 261, 283 and authorities collected n. 142 (1985).

Nevertheless, Bobbie was 52 years of age at the time of trial. There was evidence which would warrant a finding that Bobbie had undergone vascular surgery in 1984 and that she had other disabling ailments. Bobbie testified, in substance, that she was willing to work, but "physically [didn't] feel able to work an eight-hour day." She believed and was allowed to testify that she was partially disabled. William deprecated the seriousness of Bobbie's physical problems [7] but the record justifies the conclusion that Bobbie's health and her capacity to work and earn is impaired to a considerable degree.

William, by contrast, appears to be in good health. In 1980, William's net income from his practice was $203,000 and from 1981 to 1985 his compensation from the professional corporation amounted to $449,-600. In addition, he had other income. William is well able to pay the amount of maintenance ordered.

William also argues that the award of maintenance should not have been granted for an indefinite period. There may be merit in this contention. As our Supreme Court noted in *Doerflinger v. Doerflinger*, 646 S.W.2d 798, 800[2] (Mo.banc 1983), it is the policy of the courts to encourage a spouse to become self-supporting. The record evidence supports an award of maintenance; whether Bobbie's disability is permanent may be questioned. The cause, as we say, must be reversed and remanded. The trial court may reexamine Bobbie's need for maintenance for an indefinite period.

For the reasons noted, the judgment, to the extent it purports to determine the character of the professional corporation and to divide the marital property, is reversed. That part of the decree refusing to award Bobbie attorneys' fees is reversed. The award of maintenance is found to be necessary and reasonable, but upon remand, the trial court may receive further proof of the necessity for an indefinite award of maintenance. The cause is remanded.

PREWITT, P.J., and FLANIGAN and MAUS, JJ., concur.

### APPENDIX

\* \* \*

"2. The Court finds the following property to be the non-marital and separate property of petitioner:

A. 1968 Jon Boat.

B. All the common stock and ownership interest in William C. Reed, D.P.M., P.C. d/b/a Reed Foot Clinic.

C. The United Missouri Bank Account in the amount of approximately Eleven Hundred Dollars ($1,100.00).

D. Four Thousand Dollar inheritance ($4,000.00) presently located in the possession of Petitioner.

3. The court awards respondent her furs and jewelry in the approximate amount of Eight Hundred Dollars ($800.00) as her non-marital and separate property.

4. The court awards the following marital property to respondent:

A. 1985 Cadillac ................................................. $ 13,615.00
Identification No. 1GGEL5788FE604450
B. 1985 Ford Pickup 150 (white) .................................. $  6,000.00
C. Cash from sale of 1932 Massey Ferguson ....................... $  1,700.00
D. Furniture ..................................................... $  6,250.00
E. Rental Home and 2 Acres ...................................... $ 14,000.00
(More particularly described on Petitioner's Exhibit '1', Item No. 2 which is attached hereto and incorporated herein by reference).
F. All ownership interest in Bobbie's Flea Market, in Marshfield, MO.......................................................... $  2,000.00
G. Merrill Lynch, IRA Account of Wife No. 599–81347 ............. $  9,761.00
H. Midland Life Insurance/Cash Value ........................... $  5,000.00
I. Merrill Lynch joint account No. 599–15799 ................... $ 47,000.00

**7.** " ... Her brothers have had bypasses and— she just had a single bypass, too, and she had the femoral artery taken out and put back in...." [R. 67].

J. All Walmart Stock.................................... $ 27,000.00
K. Wife's Checking Account, Webster County Bank Account No. 0200126136 ........................................$    50.00
L. Wife's Saving's Account, Citizen's Bank, Marshfield MO, Account No. 01761022–10 ....................................... $    500.00

TOTAL     ... $132,876.00

5. Petitioner is awarded the following marital property:

A. 1984 Cadillac Identification No. 1GGAL5784E663363 .......................... $ 11,360.00
B. 1984 Ford—150 Pickup (brown)................................ $  6,000.00
C. 1982 Monarch, 1984 Outboard Motor, 1978 Trailer and 1986 Trolling Motor ............................................. $  7,500.00
D. Furniture............................................... $    350.00
(Including steel cabinet in Wife's possession)
E. Husband's IRA, Account No. 59989123 ......................... $ 26,181.00
F. Real estate and improvements located at 608 South Pickwick, legally described as shown on petitioner's Exhibit 1, Item No. 3... $ 70,000.00
G. The home and acreage in Elkland, Missouri, more particularly described on Petitioner's Exhibit '1' as Item No. 1, equity value... $ 20,000.00

TOTAL     ... $141,391.00

5. In order to equalize the division of property between petitioner and respondent, petitioner is ordered to pay to respondent the sum of Fifteen Thousand Dollars ($15,000.00) cash on or before August 1, 1987 and if not paid by that date to draw interest at the legal rate of nine percent (9%) per annum from the date of this judgment.

6. Petitioner is ordered to pay the loan on the Elkland residence and 23 acres in Marshfield, Missouri to United Savings and Loan Association in the amount of Sixty–Three Thousand Dollars ($63,000.00). Petitioner is also ordered to pay the bill to the Amish in the approximate amount of One Hundred Sixty–Seven Dollars ($167.00).

7. The court finds that Empire Bank Account No. 0588949 has no value and has been depleted.

8. Petitioner is ordered to pay respondent the sum of One Thousand Dollars ($1,000.00) per month as periodic maintenance for the support of respondent with the first payment to be due on or before August 1, 1987 and on the first day of each month thereafter and said payments shall

be made payable through the Circuit Court of Webster County, Missouri."